# Leghart *v.* Montour Railroad Company, Appellant.

Argued November 17, 1958. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and BOK, JJ.

reargument refused May 20, 1959.

*Harold R. Schmidt,* with him, *William M. Gardner,* and *Rose, Rose and Houston,* for appellant.

*Robert L. Prior* and *Joseph F. Weis, Jr.,* with them *Julia M. Doyle, James P. McArdle,* and *Weis & Weis,* for appellees.

OPINION BY MR. JUSTICE BOK, April 20, 1959:

The plaintiffs, husband and wife, have verdicts for personal injuries which the Court below sustained. Defendant asks for judgment non obstante or a new trial.

The accident happened at a crossing, at a time when the road was being used as a detour for Route U. S. 30. It was between three and four in the morning, rain was falling, and the road was black-topped. Plaintiffs, driving northwest on the detour, crossed a small bridge and at once came to defendant's tracks, which crossed the detour at right angles. Immediately beyond the tracks the road ended in an irregular T.

In the automobile were the plaintiffs; husband driving, his wife beside him, a son and daughter and the son's fiancée in the back seat. The driver stopped, looked, and listened, saw nothing, and went on slowly across the tracks. The blinker lights of the crossing signal were not flashing, and it was for the jury to say whether they did not flash at all, as the plaintiffs said, or whether they went on automatically when the train was 815 feet distant, as defendant said they were designed to do. In making a 90° right turn at the T, one of the car's right wheels went into a hole, three by two feet by twelve inches deep, that nestled in the angle of the turn and lay about two and a half feet from the rails at its nearest point. The driver did not see the

hole, as he was looking first at the tracks and then at the T-end of the road for traffic and for a sign telling him which way to turn. He couldn't see very well, since the rain and the black top of the road made the surface dark, and he couldn't tell whether there was a hole or not.

He tried to extricate the car by surging it backward and forward, but to no avail. When he opened the door to get out he heard the whistle of a train, and told everyone to get out at once. The two girls did so by the left door, and the son pushed the right front seat forward in order to get out from behind his mother and then turned to help her, because she had an ulcered foot. When her feet were on the ground she saw the train and pushed her son to safety. All but her got away. The engine hit the car, pushed it into her, turned it through 180°, and stopped 45 feet past the crossing.

The train was visible for 294.5 feet, due to a 45° curve from east to northeast which ended about at the crossing. It consisted of two engines and a caboose and was going from twelve to fifteen miles per hour. The engineer said that he had been whistling and belling for 2000 feet, but the left curve made the rails ahead invisible and the beam of the headlight go away from the tracks to the right. He had to rely on the fireman, who saw the car on the rails when the engine was 100 to 150 feet from it. He called at once to the engineer, who threw on the emergency brake.

A railroad's negligence may consist in failure to give adequate warning facilities not only to the traveling public but to its own crews as well. The fireman, testifying for the plaintiffs, said that a route sign located next to the blinker signal prevented his seeing the car until the engine was too close to stop. Actually, there were three obstacles to vision at that point: the

route sign, a stop sign, and the blinker signal, all bunched together. The jury could infer that without these obstructions there was room to see and act and stop. The fireman could see from 294.5 feet away; he did first see the car when somewhat less than 150 feet away; and the train did stop within 200 feet. If the obstructions did not in fact affect the fireman's view he could be held negligent for not noticing the car in time to stop, or the railroad could be held negligent for not lighting a temporary detour crossing of one of the state's most heavily traveled thoroughfares. It was admitted that the headlights and taillights of the car were on, and that there was no street light at the crossing.

Under these circumstances the questions of negligence and contributory negligence were clearly for the jury. It is therefore unnecessary to consider whether defendant had control of the crossing roadway and was negligent in maintaining it.

Defendant raises only two points that merit concern. One is that the trial judge improperly allowed testimony and pictures showing that the hole was repaired after the accident. Evidence of subsequent precautions is ordinarily inadmissible: *Baran v. Reading Iron Co.,* 202 Pa. 274 (1902); *Seeherman v. Wilkes-Barre Co.,* 255 Pa. 11 (1916). An exception exists where the purpose of the evidence is to show control or to impeach relevant testimony: *O'Brien v. Jeannette Boro.,* 128 Pa. Superior Ct. 443 (1937). But these cocks won't fight unless it is shown that the repair was made by the party sought to be charged with negligence and unless there is some witness or evidence to impeach.

We cannot say as a matter of law that evidence of these exceptional situations does not exist. The defendant or the county or the state had the duty to

maintain the roadway: both the defendant and the county denied making repairs, and no evidence was offered as to the state. Counsel for plaintiffs sought to show defendant's control. Both counsel elicited from Mr. Rometo, the county's executive, that there was no written agreement between county and defendant, and that the county's responsibility covered the whole road except the railroad's right of way. Within this area the defendant's responsibility to repair extended eighteen inches from the end of the ties and would thus include at least part of the hole. The railroad's executive, Mr. Clark, said that the defendant's right of way extended some six feet beyond the last rail but that its responsibility to repair ended at the end of the ties. The photographs and the testimony of the engineer Cooper showed the repair patch lying at least partly within six feet of the last rail and extending to a point within eighteen inches of the ties and even overlapping the tie-line.

Further, Messrs. Clark, Lombardi, and Campbell testified for defendant that they made no repairs at the hole site, as they did not do asphalt work. But Mrs. Logan testified for plaintiffs that she saw a car and a bus stick in the hole within two months before the accident, and that she saw Clark and a gang of six or seven men make the repair, shown in one of the exhibits, after the accident.

Such evidence qualifies under the exception above mentioned and hence there was no error in admitting it.

Defendant's other point is that the verdicts were excessive. The jury first brought in a single sum of $75,000, and were sent back to divide it between Mr. and Mrs. Leghart. The result was $20,000 for her and $55,000 for him. At the time of the accident he was sixty-four and she fifty-nine.

The wife's verdict was modest enough. From the date of the accident, November 16, 1951, to June, 1956, when her doctor last saw her, she had four operations. Her injuries were: an open and comminuted fracture of the right tibia and fibula, followed by osteomyelitis; multiple fractures of the pelvis; fractures of the transverse processes of two lumbar vertebrae; and mild cerebral concussion. On the fourth operation her leg was amputated at mid-thigh.

Mrs. Leghart was the mother of fifteen children, of whom nine are living. She once did all of her housework and after the children were grown she went visiting in other states during her husband's vacation. Since the amputation she can do very little and because of her age and weight she cannot use crutches or an artificial leg. To get upstairs she must sit down and hoist herself backwards a step at a time. With all of this pain and distress, physical and mental, the sum of $20,000 is short of excessive. In *Riester v. Philadelphia Transportation Co.*, 361 Pa. 175 (1949), which was a leg amputation case, a forty-eight-year old woman was allowed to keep $25,000 of a $65,000 verdict. See also *Glaister v. Eazor Express*, 390 Pa. 485 (1957).

The verdict of $55,000 for Mr. Leghart is harder to justify. His expenses were $5358.63 for his wife and $1045 for his car. The balance of the verdict must count for reasonable future nursing expenses and for loss of consortium. We know of no case where so much was allowed, especially for a husband of Mr. Leghart's age, although we cannot tell how much was allowed for future expenses and how much for consortium. In reducing it, as we feel we must, we are guided by the idea that if the jury had reversed its findings we would not likely have disturbed the verdict. We feel that $35,000 for the husband is a just result.

The judgment for the wife plaintiff is affirmed. The judgment for the husband plaintiff, reduced to $35,000, is affirmed.

Mr. Justice BELL and Mr. Justice BENJAMIN R. JONES dissent and would enter judgment n. o. v. for the defendant railroad.