Betty Jane GOSS, Executrix of the Estate
of Iva Merriman, Deceased,
Appellant,

v.

BALTIMORE & OHIO RAILROAD COM-
PANY, a Corporation.

No. 15262.

United States Court of Appeals
Third Circuit.

Argued Oct. 19, 1965.

Decided Jan. 13, 1966.

Rehearing Denied March 7, 1966.

Ganey, Circuit Judge, dissented.

Dennis C. Harrington, Pittsburgh, Pa. (McArdle, Harrington, Feeney & McLaughlin, Pittsburgh, Pa., on the brief), for appellant.

E. V. Buckley, Pittsburgh, Pa. (Mercer & Buckley, Pittsburgh, Pa., on the brief), for appellee.

Before McLAUGHLIN, FORMAN and GANEY, Circuit Judges.

FORMAN, Circuit Judge.

This is an appeal from the result of a negligence action brought in the United States District Court for the Western District of Pennsylvania by Betty Jane Goss, executrix (hereinafter appellant) of the estate of Iva Merriman (hereinafter decedent), against the Baltimore & Ohio Railroad Company (hereinafter appellee) in which a jury verdict was entered in favor of the appellee and a motion for a new trial was denied. Jurisdiction is founded on diversity of citizenship with the applicable substantive law being that of Pennsylvania.

The decedent, a widow of 47 years, was fatally injured on March 2, 1962 while in her automobile which stalled facing south on the westerly side of the Broadway Street railroad crossing in Coraopolis, Pennsylvania, when the car was struck by one of appellee's trains operating westward out of Pittsburgh. The issue of appellee's negligence and decedent's contributory negligence was submitted to the jury and resulted in a verdict in favor of the appellee.

The District Court refused appellant's requested points for charge with regard to willful and wanton negligence upon the part of the appellee's agent, the train's engineer.[1] In the main, the facts and points of law raised on this appeal relate to the propriety of the District Court's precluding the jury from considering that issue.

The relevant facts bearing upon the issue of willful and wanton negligence emerge relatively free from dispute. The crossing was not defective and the signalling equipment was sound and functioning properly. At 3500 feet the engineer could see the crossing, but he stated that his view of the stalled automobile was obscured by vehicles moving on the easterly portion of the crossing between the vehicle and his line of vision. The accident occurred at about 7:20 a. m., when workers were traveling to their places of employment and substantial traffic was moving over the crossing. At a point approximately 3300 feet east of the crossing the train automatically activated the ringing of bells and the oscillating of lights on each side of the crossing as well as a light on each highway gate guarding the crossing. Seventeen seconds after the bells and lights began to operate the highway gates were made to automatically descend to bar traffic over the crossing. The engineer testified that he was first able to observe the stalled automobile at what he put as the location of a whistle post along the tracks 1400 feet east of the crossing.

At about a mile east of the crossing he had begun to apply his service brakes to throttle the speed of the train down from 70 miles per hour to a contemplated 35 miles per hour, the rate at which his regulations required him to proceed through the Broadway Street crossing and the crossings that followed to the west through the town of Coraopolis. He estimated that at the whistle post the speed of the train was 50 miles per hour. On his first sight of the stalled car he immediately applied his emergency brakes, at a point which he estimated as 1350 feet east of the crossing. At the speed the train was then running it could not have been stopped in less than 2000 feet.

The decedent was outside of the car pushing it with the aid of a passerby

1. The appellant requested the following: "In order for wanton negligence to exist, 'it must be found that the engineer in this case had actual knowledge of the decedent's peril for a sufficient length of time before the accident to give him a reasonable opportunity to stop the train and avoid the accident and despite this *actual prior* knowledge, the engineer manifested a reckless disregard of decedent's danger. However, this actual knowledge on the part of the engineer may be deduced from the facts present herein.' Kasanovich v. George, 1943, 348 Pa. 199, 34 A.2d 523; Peden v. Baltimore & Ohio Railroad Co., 1936, 324 Pa. 444, 188 A. 586.

" 'If wanton misconduct is found to exist then, of course, contributory negligence on the part of the decedent cannot prevent plaintiff's recovery.' Geelen v. Pennsylvania Railroad Co., 400 Pa. 240, 161 A.2d 595 [91 A.L.R.2d 1]."

when the crossing gates were lowered. She then reentered the automobile. Her helper shouted a warning to her to leave the car. She did not and the tragic collision occurred. Her bizarre conduct in reentering the automobile in the very face of the locomotive bearing down upon her defied explanation.

The District Court calculated that at the rate of 50 miles per hour the train was moving 75 feet per second and that in 17 seconds, the time that elapsed from the point of activation of the crossing bells and lights (3300 feet east of the crossing) to the lowering of the gates, the train traveled 1275 feet (17 x 75). It further computed that in the 17 seconds the train reached a point 2225 feet [2] east of the crossing. The District Court assumed for the sake of determining whether to charge willful and wanton misconduct that the tracks cleared as the gates were lowered at 2225 feet. It will be remembered that the engineer testified that he observed traffic moving on the crossing until the train was 1400 feet therefrom. Thus, it is apparent that the District Court discounted the engineer's testimony in this respect. The District Court then found that between the point of 2225 feet, when the gates lowered themselves, and the point of 1350 feet, where the emergency brakes were applied, the train moved 875 feet.[3] At the rate of 75 feet per second, but reflecting that the train's speed was slackening as it approached the crossing, the District Court found that the engineer had taken no more than 10 seconds to make the decision to apply his emergency brakes, and to apply them. It concluded that although such a 10 second period of lapsed time could be held to be ordinary negligence, it was not sufficient, as a matter of law, to warrant a determination of willful and wanton negligence under the facts of this case. In

an unreported opinion [4] denying the motion for a new trial the District Court differentiated this case from Geelen v. Pennsylvania R. R. Co.[5] and held that here

" * * * the testimony is lacking in showing that he [the engineer] had actual knowledge of decedent's peril for sufficient length of time before the accident to give him a reasonable opportunity to stop his train and avoid the accident."

Willful and wanton misconduct was defined in the recent case of Evans v. Philadelphia Trans. Co.; [6]

" * * * Correctly speaking, wilful misconduct means that the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue. This, of course, would necessarily entail actual prior knowledge of the trespasser's peril. Wanton misconduct, on the other hand, 'means that the actor has intentionally done an act of an unreasonable character, in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a conscious indifference to the consequences. * * *' Prosser, Torts § 33 at 151 (2d ed. 1955)."

In our case the gates began to descend to clear the crossing when the train was 2025 feet from it. This left practically no time for the engineer to discern the danger and to apply his brakes if he was to avoid collision by bringing his train to a stop within 2000 feet. It is apparent as a matter of law, that the engineer's conduct fell without the above definition of willful or wanton misconduct. The risk of impact with decedent's stalled

2. Actually the subtraction results in 2025 feet.

3. Reflecting the correction in note 2 supra the calculation of 875 feet is reduced to 675 feet.

4. Goss v. Baltimore & Ohio Railroad Co., Civil No. 62–588, W.D.Pa., Jan. 12, 1965.

5. 400 Pa. 240, 161 A.2d 595 (1960).

6. 418 Pa. 567, 573–574, 212 A.2d 440, 443 (1965).

automobile could neither have been obvious nor known to the engineer. As was aptly stated in Evans, within the context of the facts of that case:

> " \* \* \* He [the engineer] specifically stated that he did not realize that there was a human being lying in the tracks until 'the last moment' and that it was then too late to stop the train in time to avoid the accident. If his testimony were limited to this explanation, the plaintiff would not have made out a case. See, Zawacki v. Pennsylvania R.R. Co., 374 Pa. 89, 97 A.2d 63 (1953)." [7]

Our record, however, does reflect a simple situation in which there were absent both the time for the engineer to have been aware of the danger, and the ability of the engineer to have prevented the accident once the danger reasonably became apparent. Willful and wanton misconduct was, therefore, properly excluded from this case.

■ Appellant further argues that the District Court erred in refusing to instruct the jury that the appellee could be charged with willful and wanton misconduct in entrusting its train to an incompetent crew. No such objection was made to the charge under Federal Rule of Civil Procedure 51 before the jury retired to consider its verdict. The appellant has not properly preserved the point for appeal. Apart from this consideration an examination of the record fails to reveal any merit to the contention.

■ Appellant also contends that it was error for the District Court to have instructed the jury that any verdict which it might render for the appellant must be modest. As the verdict went for the appellee on the liability issue, it is difficult to believe that such a charge, even if erroneous, would be prejudicial to the appellant. When read in context of the charge as a whole, however, it appears that the District Court did properly instruct the jury that due to the meager income of the plaintiff's decedent, to-

gether with her age, any verdict for the appellant would have to be modest. This was an accurate observation by the District Court and surely clear to the jury as it was made within the context of the District Court's stating relevant facts which the jury was to consider in weighing the damage issue.

Based on the above considerations, the judgment in favor of the Baltimore & Ohio Railroad Company, the appellee, and the order of the United States District Court for the Western District of Pennsylvania entered on January 12, 1965 denying the appellant's motion for a new trial will be affirmed.

GANEY, Circuit Judge (dissenting).

I dissent.

March 2, 1962, at 7:20 a. m., was a bright, clear, dry day. A westbound train leaving Pittsburgh, at this time, crashed into the Chevrolet car of Mrs. Iva Merriman, a widow, in which she was an occupant and which was stalled on the track at the Broadway crossing of the Baltimore & Ohio Railroad Company, in the town of Coraopolis, killing her instantly, hurtling her body in the air, completely demolishing the Chevrolet and finally coming to a stop one block west of the crossing.

The question here involved is whether, under the factual circumstances obtaining, the district court should have granted the appellant's request for instructions as to wanton conduct, on the part of the engineer of the defendant company and thus allow the jury, to resolve the question instead of refusing the same as a matter of law.

The defense interposed for this tragic happening, was (1) that the engineer, Merritt Kelley, was unable to see the stalled car on the track on which he was running in time to stop his train, and (2) that the traffic at the crossing obscured his vision thereof, thus preventing him from so doing.

The majority relies almost entirely on the engineer's testimony, as to the speed

7. Id. at 572, 212 A.2d at 443.

of the train and the distance to the crossing and concludes that the court below, was correct in refusing the proffered instruction, since he was unable to stop the train in time to avoid the collision.

We shall consider each factor separately and first discuss the testimony of the engineer, Kelley, and Fireman Van Camp, whose testimony follows that of the engineer, and then proceed to discuss the testimony of on-the-scene eye witnesses to the occurrence and, after carefully reviewing the same, it is submitted the court below was clearly in error in refusing the instruction requested by appellant's counsel.

As has been indicated, the majority relies upon mathematical deductions, taken from certain testimony of the engineer, to prove that he was unable to see the stalled Chevrolet on the track, on which he was running until he was 1300 to 1400 feet from the crossing. It must be conceded, to some degree at least, to look backward in retrospect two years from the date of the happening to the date of trial not knowing at that time anything unusual was to happen, and presently to gauge the speed of the train, at a given point along the track, as well as to state the number of feet traveled per second, makes the human judgment with respect thereto, if not speculative, it at least strains credibility to its utmost limits.

However, we will take the engineer, Kelley's own admissions and we discover the following facts: He testified he was going 70 miles per hour in an unrestricted area, about one mile east of the Broadway crossing and that at least 3500 feet from the same he had a clear and unobstructed view down the track to the crossing. Heath, one of the defendant railroad's own witnesses who was in charge of all interlocking equipment, automatic wayside signals and crossing protections and who had been therein engaged for more than forty-two years, testified that at 3300 feet east of the crossing is a point where, when the train passes thereover, a circuit is closed and that, automatically, at this distance, on both sides of the track, bells begin ringing and red lights begin flashing as a warning signal to approaching traffic, that a train is approaching. While there is some confusion about the lowering of the gates since Heath testified as follows, "After the bell has started to ring, the bell and the *gates* will operate for seventeen seconds before the gates will start going in a downward position." (Italics ours.), we will nevertheless assume that the gates will start to be lowered seventeen seconds after the bells begin to ring and the lights flash. However, Kelley, the engineer, testified that he did not know at what point along the tracks from the crossing the warning to traffic of an approaching train started, though he made this run some twenty times a month.

It seems almost certain that any rational person would not attempt to go over a railroad crossing with the ringing of bells and the flashing of bright, red lights and, also, that persons on the crossing would scurry off immediately upon hearing and seeing the warning signals. Therefore, it would seem that almost immediately after the engineer passed the 3300 feet signal, there was little, if any, traffic on the crossing and that a stalled car, we can assume four and one-half to five feet above the tracks, is plainly visible. Certainly, at least, it can be assumed that seventeen seconds after the warning signals had begun and the gates were being lowered, traffic was being physically barred from the crossing and that the same had cleared thereon. In that time Kelley had traveled 1247 feet and subtracting 1247 feet from 3300 feet, he was then 2053 feet from the crossing.

He further testified that he could stop his train at a speed of 50 miles per hour within 2000 feet and here he had a little over 2000 feet when we have every reason to assume that the crossing was clear. However, he testified that he could not see the stalled automobile due to the traffic on the crossing until he was 1300 to 1400 feet away and he connects this distance with a point immediately after he passed the whistle post, a concrete post

with a large "W" on it. However, again adverting to the testimony of the defendant's witness, Heath, who, certainly according to his qualifications, was the most competent to testify as to automatic wayside signals and the distance to the crossing, the distance from the whistle post to the crossing was a little over 3300 feet. Thus, if we believe Heath, the defendant's witness and one who is certainly knowledgeable about the existing signals, and Kelley, himself, who said that at or about the whistle post he saw the car, he must have had about 3300 feet within which to stop his train.

There is the additional testimony of the police officer, White, who testified that immediately after the occurrence he was on the scene and took a statement from the engineer, Kelley, as he put it, "exactly" as Kelley told it to him and which he wrote down, who said that he was going 25 miles per hour when he saw the car on the tracks. Again, if he could stop his train at 50 miles per hour in 2000 feet, he certainly could have stopped it at 25 miles per hour in 1000 feet, thus leaving him 300 to 400 feet leeway in which to bring his train to a stop before the crossing. Kelley also testified that he was going 70 miles per hour, in conformity with the rules of the railroad, in a non-restricted area outside of the town of Coraopolis. He persisted in saying that 70 miles per hour was the maximum allowable speed, and even when a timetable was shown him indicating the rule was 65 miles per hour, he rejected this 65 mile per hour rule saying that the timetable was not in effect at the time of collision. Upon further examination, he finally admitted that 65 miles per hour was the correct maximum speed he was permitted to travel in the non-restricted area which began about a mile outside the town of Coraopolis and that he was mistaken in saying it was 70 miles per hour. His belief that 70 miles per hour was the maximum speed allowable, at which rate of speed he said he was traveling, made him either violative of the company rule or at least it had some bearing on his statements on speed and the distance traveled when the train came within the restricted area, although later to shore up his original contention that he was going 70 miles per hour, he said he believed he had a tolerance of 3 to 5 miles per hour.

The defendant's witness, Fireman Van Camp, who was riding across from the engineer in the diesel, testified that the position of the whistle post along the trackway had not been changed for two or three years before this occurrence and that it was on the right side of the trackway, on the same side as that of the engineer. He estimated the train speed at that time at "probably less than 50 miles per hour." He further stated that he had been on this particular run for a year and a half and had been acquainted with this trackage for four to five years and that he, likewise, passed this whistle post some twenty times a month. He also stated that he first saw the Chevrolet on the crossing just west of the whistle post.

These few instances in the testimony of the engineer, Kelley, can show how contradictory and wholly unreliable his testimony was, as to the speed of the train, and the distance he had to traverse before he reached the crossing. In my judgment, he obviously did not see that which was plainly to be seen, had he looked, and his conduct in control of an instrument capable of destruction—twelve cars and two diesel engines—hurtling along at 70 miles per hour and being gradually reduced to the permissible speed of 35 miles per hour at the crossing, gave ample evidence in the record on which the jury could pass, as to his wanton conduct.

As to the traffic at the crossing. The witness, Casperone, testified, without contradiction, that from the time an eastbound train went by the crossing—in the opposite direction—up until the time the westbound train went by the Broadway crossing, seven or eight minutes elapsed. The witness, Raddant, testified that he was the driver of a school bus and he made the crossing every morning at about this time, and that when

he came to the crossing, Mrs. Merriman's car was the only car between his bus and the crossing and that behind him there were possibly two or three cars. They waited until the eastbound train passed and the gates rose and Mrs. Merriman started over the track, which was the first one she came to, and had just gotten over the north rail and onto the main part of the track when her car stalled. Seeing her predicament, he put his bus in gear and attempted to push her off the track, but was unable so to do, and again he attempted to push her with his bumper but it was too high as it struck the trunk of her car. He then saw that he was unable to help her. He blew his horn a couple of times to signal to her to look, but she paid no attention to him and he presumed she was excited as, at this time, he wanted to again try to push her with his bumper. He said this took about a half minute but then again said he couldn't give a real estimate of the elapsed time. He then went around her and made the crossing, assuming those behind would help her. This testimony clearly shows that Mrs. Merriman's car was on the track almost seven or eight minutes before it was struck. A witness, Marks, testified that he was making the crossing and, as he came over it, Mrs. Merriman was some six feet from her car when she raised her hand to stop him, which he did. He rolled down his window and she asked him if he would help her and he told her he would. He told her to get into the car and he drove on over the crossing about a block, turned around, and came up to the crossing but, as he did, the gates were coming down and he was unable to get over to get to the tracks. He makes no mention of any other traffic. The witness, Francschini, testified that he was standing on the corner of Fourth and Broadway, about to deliver papers, when he looked south, which was about a block, and he saw the Merriman car, which he knew and recognized, stalled on the tracks. He went out Fourth Street with two or three papers, a distance of 150 feet and de-livered them to the Embassy Hotel, which took him, he estimated, from three to five minutes and when he returned to the corner to pick up a sack of papers which he had left there, he again looked at the crossing, the gates were down and one, Lucci, was helping Mrs. Merriman push the car, Lucci in the rear and Mrs. Merriman alongside the car at the driver's wheel. He watched them pushing the car, saw Mrs. Merriman get back into the car and try to start it again and saw the train come along and strike the car. This witness places Mrs. Merriman and her stalled car on the tracks at least three minutes which would have the train approaching for more than two miles away while she was stalled on the crossing.

Furthermore, to advert to the testimony of the witness, Heath, once more, he stated that as he *approached* the crossing at Mill Street, which is two blocks west of Broadway, the gates were down. He stopped his car and, as he had a clear view to the east, he could see that the gates were down at Broadway also and he saw the train coming which he said was 1600 to 1800 feet east of the crossing. This, likewise, is contradictory of the engineer's testimony for he said, as has been stated before, that he was 1300 to 1400 feet away before he could see the car at the crossing and, according to Heath's testimony, the crossing was clear, the gates were down which prohibited any crossing and he was 1600 to 1800 feet away.

While the majority speaks of "substantial" traffic at the crossing, the only persons who testified to traffic making the car and Mrs. Merriman not visible, are the engineer, Kelley, and the fireman, Van Camp. The other witnesses, either do not mention any traffic going across the crossing or, at most, a bus and three cars. Furthermore, Officer White, who as has been previously stated, was on the scene right after the occurrence, testified that at that time the traffic was "medium" and this in view

**656**

of the fact that a tragic accident had occurred and ordinarily traffic would be drawn to the scene.

The law is clear that assuming contributory negligence on the part of the plaintiff, one is not barred from recovery, if the conduct of the defendant is wanton in nature. Geelen v. Pennsylvania Railroad Company, 400 Pa. 240, 161 A.2d 595. The factual situation there was nearly identical with the instant case except decedent's stalled car on the track was the result of a hole therein, while in our case there was engine difficulty. The court therein stated, p. 244, 161 A.2d p. 598, "there was additional substantial proof which, if believed by the jury, warranted a conclusion of negligence in that decedent's presence on the crossing continued for sufficient time and under such circumstances as to provide the engineer of the train, if sufficiently alert, with knowledge of decedent's perilous predicament and with a reasonable opportunity to bring the train to a stop before it reached the crossing: Kurtz v. Philadelphia Transportation Company, 1959, 394 Pa. 324, 147 A.2d 347; Leghart v. Montour R. Co., 1959, 395 Pa. 469, 150 A.2d 836." Thus, it was a question for the jury.

The majority cites Evans v. Philadelphia Transportation Company, 418 Pa. 567, 212 A.2d 440, which is entirely inapposite on its facts, since the occurrence happened at night; it concerned the Market Street Subway in the City of Philadelphia; the headlight on the train illuminated the distance ahead only 200 feet, and the decedent was lying prone on the tracks. This situation is entirely different, from the factual situation obtaining in the instant case, with reference to light, as the occurrence was in a darkened subway and the decedent was lying prone on the track as contrasted with an automobile standing four and a half to five feet high in broad daylight.

I would reverse the judgment of the lower court and grant a new trial.