Dale C. CAGE, Administrator of the Estate of Carolyn Sue Cage and Dale C. Cage, Administrator of the Estate of Antoinette E. Cage, and Dale C. Cage, Plaintiff,

v.

NEW YORK CENTRAL RAILROAD COMPANY, a corporation, Defendant and Third-Party Plaintiff,

v.

Dale C. CAGE, Administrator of the Estate of Carolyn Sue Cage, Third-Party Defendant.

Civ. A. No. 1141.

United States District Court
W. D. Pennsylvania.

Feb. 3, 1967.

Leonard Price, Louis M. Tarasi, Jr., Pittsburgh, Pa., James D. Loesch, Erie, Pa., for plaintiff.

Irving O. Murphy, Erie, Pa., for defendant and third-party plaintiff.

John G. Gent, Erie, Pa., for third-party defendant.

## OPINION

WEBER, District Judge.

This wrongful death and survival action arises out of a collision between an automobile and a train on the Pittsburgh Avenue grade crossing at the western limits of the City of Erie. The jury by special interrogatories found the decedent driver contributorily negligent but found the railroad guilty of wanton and wilful misconduct and awarded damages to plaintiff administrator for the death of the driver and the guest passenger.

Much of the factual background of this case concerns the layout of this grade crossing. Pittsburgh Avenue is a very heavily traveled traffic artery, running north and south. At the point of the accident it crosses perpendicularly adjoining rights-of-way of two railroad companies, the Pennsylvania Railroad to the north containing three tracks, and the New York Central to the south containing three tracks. The street crossed seven tracks originally, but at the time of the accident the northernmost New York Central track had been removed at the street crossing but the remainder of this track leading westward from the street was still in place. The removal of this track at the street crossing left a space of twenty-five feet between the southernmost Pennsylvania Railroad track, and the northernmost New York Central track. Coming to the crossing from the north, as the decedent driver was doing, there is a signal flasher at the right-hand side, and beside this is a small shed. One must pass this signal and shed before the tracks to the west can be viewed. At that point an automobile would be upon the northernmost Pennsylvania Railroad track. The Pennsylvania Railroad tracks to be crossed also connect with switching yards to the east of Pittsburgh Avenue. After passing the three Pennsylvania Railroad tracks and the twenty-five foot cleared space there are three New York Central tracks. From north to south the area of the street crossed by tracks is over one hundred feet in length.

Much testimony was introduced concerning a peculiarity of the signal flasher. Pennsylvania Railroad trains, switching or standing on tracks to the east of Pittsburgh Avenue, were frequently visible to drivers using this grade crossing. It was established that these trains would activate the crossing signal if they approached within 341 feet east from the crossing. This signal flasher is also operated by a contact on the New York Central Railroad main line tracks 4,054 feet west of Pittsburgh Avenue, the direction from which the train in question was approaching. There was considerable testimony that the flashing signal would operate at times when no train was seen approaching but when Pennsylvania Railroad trains were seen standing or switching to the east. There was also testimony that the lights would operate when no trains were approaching, and that traffic police were on occasions called to relieve the traffic tie-up and railroad maintenance personnel were called to shut off the signals. This situation was known to drivers who used this grade crossing frequently, including plaintiff's decedent driver.

At about 5 p. m., on April 18, 1964, a rainy, misty afternoon, three cars approached this crossing from the north. The first car was occupied by Mr. and Mrs. Steger. As they approached there was a Pennsylvania Railroad train to the east, either standing or slowly moving. As Mr. Steger passed the signal standard on the north side and was on the northernmost Pennsylvania Railroad track the warning signal began flashing. He observed this by seeing the flashing signals ahead at the southern side of the crossing. His wife, sitting in the right front seat, saw nothing to the west. He proceeded across when his wife called out that a train was approaching from the west. Her attention was first attracted by its headlights. At her cry, Mr. Steger looked to the right, saw the train approaching and stepped on the gas and got out of there.

The next car in line was that of Mr. Wolff. He was following Steger's car and noticed the business name and address painted on the rear of the station

wagon. When he came onto the crossing the warning lights were flashing. He brought his car to a dead stop, looked east and saw the Pennsylvania Railroad train standing, and came to a conclusion that the Pennsylvania Railroad train was activating the signal, based on prior observations at this crossing for several years. He looked west and saw nothing approaching. He then proceeded to cross and while crossing saw the headlight of a locomotive approaching from the west, whereupon he accelerated rapidly and cleared the crossing just ahead of the approaching train.

The third car in line proceeding south was that occupied by plaintiff's two decedents. It was struck by the New York Central train proceeding eastwardly along track No. 2 at 78 m. p. h.

The engineer of the nearby Pennsylvania Railroad train testified that he was proceeding westwardly and brought his locomotive to a stop at a point east of the Pittsburgh Avenue crossing. He did not reach the point where his locomotive would activate the Pittsburgh Avenue warning signal. He saw the warning signal flashing and saw several vehicles proceeding across the crossing from north to south, including the Cage car. It appeared to be bumper-to-bumper behind the car ahead. He saw the headlight of the eastbound New York Central train come into view, and saw the train collide with decedent's automobile.

A train approaching this crossing from the west activates the flashing signal from a contact point 4,054 feet away. At this point the train is out of sight of the crossing around a curve. At a point 1,983 feet west the curve straightens and the crossing is first visible. At a point 1,663 feet west there is a marker for a whistle post.

The engineer of the New York Central train testified that as he rounded the curve and came into view of the Pittsburgh Avenue crossing he saw three cars which he described as being on the Pennsylvania Railroad property. This would be the three northernmost tracks of the crossing and part of the twenty-five foot paved area between the Pennsylvania Railroad and New York Central tracks. The last car, the plaintiff's Volkswagen, was south of the Pennsylvania Railroad shanty, and thus actually on the railroad tracks which form part of the crossing. The cars were bumper-to-bumper and appeared to be standing. At a point fifty feet west of the whistle post he started to blow the regular crossing whistle signal and as he saw the first and second cars moving he broke into several sharp blasts of the whistle. He observed the first car clear his track, he saw the second car just barely clear his track, but he never saw the third car, even when it hit. He was proceeding at 78 m. p. h. and did not attempt to reduce speed or apply brakes until the collision. He testified that he did not attempt to brake or decelerate when he first saw the three cars on the Pennsylvania Railroad tracks because he thought they were going to wait until he passed, and that only after he had begun to blow the whistle did he see the first two cars moving. He testified that it would have been useless to apply the brakes or attempt to reduce the speed of the train at that distance. He testified that if he had decelerated when he first saw the cars, the reduction in speed would not have been noticeable in that distance. He apparently did not consider the application of emergency brakes because of danger to personnel on the train. There was expert testimony on behalf of the Railroad that on a train of this size, without counting individual reaction time, it takes ten seconds from the time of application of full service brakes for them to begin their effect, and three seconds after the application of emergency brakes to have them begin their effect, and these times are the same regardless of the speed of the train because of the mechanics of operation of air brakes.

The case was submitted to the jury on a charge of negligence, wanton negligence and contributory negligence. Four interrogatories were answered by the jury. They found the railroad guilty of negligence, the plaintiff's driver guilty

of contributory negligence, the railroad guilty of wanton negligence, and the driver free of wanton negligence. They returned a general verdict for both decedents. Defendant has moved for judgment N.O.V. and for a new trial.

## THE DEFENDANT'S MOTION FOR JUDGMENT N.O.V.

Defendant's main contention in moving for judgment N.O.V. is that the submission of the issue of wanton negligence to the jury was error because there was no evidence of wanton negligence. Defendant also argues that there was no evidence of negligence on the part of the railroad, but this would not be material in view of the finding by the jury of contributory negligence of plaintiff's driver.

In considering the N.O.V. motion we must take all evidence and all inferences reasonably arising therefrom in the light most favorable to plaintiff. A jury verdict must be affirmed if any reasonable inference from the facts support it. Evans v. Philadelphia Transportation Co., 418 Pa. 567, 212 A.2d 440 (1965).

The evidence and inferences in favor of the plaintiff here may be taken to establish that:

1. The Pittsburgh Avenue crossing is a heavily traveled crossing in a populated area.

2. The crossing is not protected by gates, but has a flashing light sign whose function is confusing in that it will operate when no thru trains are approaching, including operation by trains visibly standing or switching nearby.

3. The peculiarity of operation of the signal was known to many people using the crossing including plaintiff's decedent driver.

4. Approaching from the north the driver of a vehicle cannot see to the west on the thru tracks until he has passed the signal and the adjoining shed and is actually upon the northernmost track of the crossing.

5. To clear the crossing one must pass three Pennsylvania Railroad tracks, then a twenty-five foot clear space which has a track leading up to it from the west, and then cross three New York Central tracks.

6. The flashing light will begin operation at the approach of a New York Central train 4,054 feet west of the crossing, out of sight of persons using the crossing.

7. The crossing is first visible from a train approaching from the west at 1,983 feet.

8. A driver on any track of the crossing, seeing an oncoming train, has no way of knowing on which track the train is approaching and thus believes himself in a position of peril.

9. The twenty-five foot cleared space between the New York Central and the Pennsylvania Railroad tracks also appears to be a position of peril to one upon it because in looking to the west from inside an automobile tracks lead directly into it.

10. In heavy traffic, a driver can only clear the crossing by proceeding ahead.

11. The New York Central Railroad had knowledge of the dangerous nature of the crossing.

12. The New York Central had a track speed posted for this heavily traveled crossing at 80 m. p. h., a speed at which its trains could not be stopped within the range of visibility from the curve to the crossing.

13. The engineer was running the train at 78 m. p. h. before he came into view of the crossing, knowing that it could not be stopped in time if there were something on the crossing.

14. When the engineer came into view of the crossing, at a point 1,983 feet away, there were three southbound cars already upon the Pennsylvania Railroad tracks of the crossing.

15. The jury could disregard the testimony of the New York Central engineer because in one highly significant element it is contradicted by all of the

other eyewitness testimony. He testified that as he rounded the curve and came into view of the crossing at 1,983 feet there were three cars standing on the Pennsylvania Railroad tracks south of the signal and the shanty, and that he thought they would remain. He further testified that he did not see any of them move until after he had passed the whistle post at 1,663 feet. But, Mr. Steger's testimony is that he was already upon the crossing when the light began to flash (the train bein.· then 4,054 feet away and out of sight). Mrs. Steger testified that the Steger car did not stop and that they were moving across when she saw the train come into view around the curve. Mr. Wolff stopped in coming upon the crossing, saw nothing to the west, and was proceeding ahead when the train came into view. Mr. Holmes, the Pennsylvania Railroad engineer who viewed the whole scene, saw the Cage car moving ahead at either a moment before or at the same time as the New York Central train came into view. The Cage car did not stop at any time.

16. The engineer did nothing to retard the movement of the train upon its first view of the cars upon the crossing.

17. At a speed of 78 m. p. h. the train was moving a distance of 111.54 feet per second. At the time the crossing first came into view the engineer had seventeen seconds before reaching the crossing. The effect of full service brake application is first felt after ten seconds, the effect of emergency brake application is first felt in three seconds.

18. Even at a slow speed the plaintiff's automobile would have cleared the track upon which the train was approaching in less than a second.

Defendant strongly argues that in instructing the jury the court omitted an essential element from the wanton negligence charge, the requirement that the actor had sufficient time to do something to avoid the accident after the actor had or should have had knowledge of plaintiff's presence in a position of peril.

In reviewing our charge we note that the jury was specifically told in the instruction on wanton negligence, "You must also consider the ability of the engineer to slow down or stop the train within the time and distance involved to the extent they have been shown by the evidence." The court then reminded of the time and distance formula of multiplying miles per hour by 1.43 to determine feet per second. This instruction was repeated in the same language upon request of the jury. The jury was also told to consider "whether in view of the known facts the trainman did something or failed to do something which reasonably could have been done under the circumstances to avoid an unreasonable risk of harm to someone within the range of the effect."

As argued by the defendant the court in its charge relied upon the case of Evans v. Philadelphia Transportation Company, 418 Pa. 567, 212 A.2d 440 (1965), and Restatement of Torts, § 500. As *Evans* adopted the rule of § 500 of the Restatement, defendant argues that it is essential for proof of wanton negligence that the actor knows or has reason to know of plaintiff's peril for a sufficient length of time before the accident to give him a reasonable opportunity to avoid the accident. Evans v. Philadelphia Transportation Co., supra, Geelen v. Pennsylvania Railroad Co., 400 Pa. 240, 161 A.2d 595, 91 A.L.R.2d 1, Goss v. Baltimore & O. R. R. Co., 355 F.2d 649 (3rd Cir, 1966).

In the *Evans* case the defense was that the motorman did not realize that there was a human body lying on the tracks until the very last moment when it was too late to stop the train to avoid the accident. But the Court found that there was evidence that the engineer saw an object on the tracks near a platform where people congregated when he rounded a curve and came into sight, at a point where he could have done something to stop the train. Similarly, in the present case the first notice to the engineer was at 1,983 feet, when he rounded the curve and saw three automobiles "on

the Pennsylvania property", but within the track area of this grade crossing. He did nothing. The reasonableness of his judgment at the time and under the circumstances were for the jury.

In Goss v. Baltimore & O. R. R., 355 F.2d 649 (3rd Cir., 1966) the circumstances are different. The Court found that the crossing was not defective and the signalling equipment was functioning properly. A signal light and bell was activated from 3,300 feet away. Seventeen seconds after the lights and bells begin the highway gates are lowered automatically. The train was operating at 70 m. p. h. but at a point one mile east of the crossing the engineer began to throttle down the speed by applying service brakes to a contemplated 35 miles per hour, which his regulations required at the crossing. At the point of a whistle post, 1,400 feet from the crossing he first observed plaintiff's stalled automobile on the tracks. His speed was then 50 miles per hour. At a point 1,350 feet from the crossing *he applied his emergency brakes*. The engineer testified that he could not see the stalled car until 1,400 feet because of traffic moving across the crossing. The District Court disregarded this testimony, and concluded the tracks cleared from the time of lowering the gate, when the train was 2,025 feet away. The brakes were applied at 1,350 feet, or within ten seconds from the time of lowering the gates. The District Court found that while this could be held to be ordinary negligence, it would not support a determination of wanton and wilful negligence. On appeal the Court of Appeals affirmed.

In Moss v. Reading Co., 418 Pa. 598, 212 A.2d 226 (1965), the plaintiff was a pedestrian trespasser. The engineer saw him cross two tracks when the train was 1,500 feet away. The headlight was on and the whistle sounding. The engineer assumed that he would stop and await the passage of the train. When the pedestrian started to cross the third track on which the train was approaching *the engineer applied emergency brakes*. He could not stop in time. The Pennsylvania Supreme Court said:

> "The engineman had every right to believe that a man, walking diagonally across the tracks toward an oncoming train with its headlights full beam and emitting warning whistle blasts, would stop at the center track, letting the train pass, rather than walk directly into its line of travel." 418 Pa. 598, at p. 602, 212 A.2d 226, at p. 228.

Defendant argues that this is applicable to this case because when the engineer first saw the Cage car she was not in a position of peril since she was "in fact stopped off the tracks." This is not the evidence here. The Cage car was first seen by the engineer on the northernmost Pennsylvania Railroad track, the third car in a row, bumper-to-bumper. The other two cars saw nothing approaching from the west as they proceeded, but as the train came into their view they hastened to clear the tracks. Mrs. Cage had no way of knowing which of the seven tracks leading west from Pittsburgh Avenue the train would approach on. Even the twenty-five foot pavement between the Pennsylvania Railroad and the New York Central was a position of peril to her because looking west a track led right into it. In our opinion her position is not comparable to *Moss*. In our opinion *Moss* is controlled by the following finding:

> "It was at that point that the emergency brake was applied. *The mere fact that this action was too late to avoid the accident can in no way detract from the fact that the engineer took reasonable care to avoid the accident the minute he realized that decedent was in a position of peril.*" (emphasis supplied). 418 Pa. 598, at p. 603, 212 A.2d 226, at p. 229.

In both *Goss* and *Moss*, the engineer *did apply the emergency brakes*. They were too late. In *Goss* the trial judge felt that this delay was negligence, but not wanton.

Plaintiff produced as a witness an engineer from the nearby Pennsylvania

Railroad train that was standing near the crossing. On cross-examination he stated that there was nothing the engineer of the New York Central train could have done at the speed he was going to avoid the accident. Plaintiff also subpoenaed the engineer and fireman of the New York Central train who also testified that they could not have stopped the train before the crossing by applying the brakes when he first viewed the cars on the crossing. Defendant argues that plaintiff is bound by this testimony.

■ With regard to defendant railroad employees, we do not believe that it is binding upon a party opposing the railroad in a law suit. The witnesses were the fireman and engineer of the train involved. They were not present in the court room when plaintiff began his presentation and the plaintiff was only able to produce them by subpoena when the court ordered defendant to reveal their whereabouts. They cannot bind plaintiff. Johnson v. Baltimore & O. R. R., D.C., 106 F.Supp. 166, affd. 208 F.2d 633 (3rd Cir., 1953); Klepal v. Pa. R. R. Co., D.C., 129 F.Supp. 668, affd. 229 F.2d 610 (2 Cir. 1956).

It further appears that the witnesses were not talking about the application of emergency brakes. The engineer testified that he did not apply emergency brakes *after* the collision because such an application might injure personnel on the train. Yet the railroad's expert witness testified that emergency brakes begin to take effect in three seconds from their application as against ten seconds for service brakes to begin their effect. The essential element here is not the stopping of the train, but the slowing of its rate sufficient to allow an automobile to cross its tracks. This was a situation where split seconds were vital. With regard to the eyewitness testimony of the Pennsylvania Railroad engineer we believe that there is both contradictory testimony and inherent improbability. Evans v. Phila. Trans. Co., cit. supra, 418 Pa. p. 572, 212 A.2d 440; Matthews v. Derencin, 360 Pa. 349, 62 A.2d 6 (1948).

It must be remembered that this was a particularly dangerous crossing. It was heavily traveled. There had been no change in the type of crossing protection for many years, despite its change from a rural area to a heavily built-up area. There were no gates, and the signal was defective in that its warning of the approach of trains was unreliable. In Gerg v. Pennsylvania Railroad, 254 Pa. 316, 98 A. 960 (1916), a warning bell which operated when trains were not crossing because of other uses of the track negates the inference of negligence in passing the crossing while the bell was ringing because the public could not depend upon it to show when it was safe or unsafe to cross. In Conner v. Pennsylvania Railroad Company, 263 F.2d 944 (3d Cir. 1958), where it was shown that blinker lights would operate when no trains were crossing, because of the switching of nearby freight trains, it was held that if the driver was familiar with this situation it would permit an inference that he had been bilked into ignoring the lights. In Baltimore & O. Railroad v. Felgenhauer, 168 F.2d 12 (8th Cir. 1948), the flashing lights would be activated by trains on sidings when no thru train was approaching. Plaintiff's decedent knew this. The lights were flashing but decedent was waved across the track by defendant's inexperienced watchman. He was struck by defendant's train. Defendant railroad knew this was a dangerous crossing because prior accidents happened there. The railroad permitted its train to pass this busy crossing in a heavily populated area at 70 m. p. h. with a knowledge of the inadequacy of its signal. The Court affirmed a submission to the jury and a finding of wilful and wanton negligence on this evidence.

■ In summary, this case presents a situation where an engineer is operating a fast train at 78 m. p. h. approaching a crossing which he cannot see. The crossing is a heavily traveled one, the scene of prior accidents, where the signal lights do not always give proper warning of approaching trains. The

crossing is seven tracks wide, although one track in the middle had been removed at the street crossing only. Automobiles must come upon the first track on the north side before they can even see to the west. At 1,983 feet distance he came in view of the crossing with three cars upon it. The engineer testified that he took no action at this time because he thought that the cars would remain where they were. But it is clear that all three cars were then on the tracks of the crossing; a position of peril to them which they could only escape by going ahead and clearing the entire crossing. All other eyewitness testimony establishes that the cars were moving ahead when the train came into view. It was at this point that the duty to take reasonable care to avoid the accident arose. He did nothing. He had 1,983 feet or seventeen seconds time to do something which might retard the speed of the train before the crossing and allow the moving cars to clear the track. Ten seconds after pushing the service brakes, the retarding action begins; three seconds after pushing the emergency brake the retarding action begins. Emergency brakes are used in such situations; see Goss v. Baltimore & O. R. R.; Moss v. Reading Co., supra. The engineer did nothing. He followed the principle stated by his fireman, "Some of the lucky ones make it, you don't do nothing." Upon this cold set of facts, the court submitted the issue of wanton negligence to the jury.

The motion for Judgment N.O.V. will be denied.

### DEFENDANT RAILROAD'S MOTION FOR NEW TRIAL

In moving for a New Trial, defendant cites several grounds.

■ The Court did not feel that the final summation of plaintiff's counsel to the jury required a mistrial. The court admonished the jury that it was not to act as the conscience of the community to punish the defendant. We believe that the argument was within the bounds of proper advocacy. (See Mercer v. Theriot, 377 U.S. 152, 84 S.Ct. 1157, 12 L.Ed. 2d 206 (1964).

■ At noon on Friday, the final day of evidence, the local newspaper published an article with a picture of another of defendant's railroad crossings, which alleged a misleading signal light, and called the situation a "death trap." It was unlikely at that time that any of the jurors had seen the article. The court refused defendant's request to limit final summation so that the jury could receive its charge and be secluded thereafter to avoid contact with the newspaper. This the court refused, since it was then Friday afternoon. The closing addresses of counsel lasted until after 5 p. m. Jurors for this panel are selected from areas as distant as 150 miles. The court allowed them to return for the charge on Monday morning. No inquiry was made of the jurors, so as not to arouse their curiosity, and they were charged strictly to confine their deliberation to the evidence produced in the courtroom. The article did not concern this case or this crossing. To have permitted examination of individual jurors would have only drawn their attention to the article, or aroused their curiosity. No request for such examination was made and the court would have allowed none.

The claim of prejudice is based solely on supposition and speculation. The court, using hindsight, sees no better alternative to its course of action than that taken. It does not consider the matter sufficient as grounds for a new trial.

■ Defendant claims that it is prejudiced by the court's refusal to accept evidence from its expert as to the time required to stop the train. The ruling on this matter was dictated by the discovery proceeding prior to trial. The plaintiff had filed interrogatories requesting information on stopping distances of trains of similar make-up at various speeds. Defendant objected. The court, after hearing, supported defendant's objections in part, but ordered certain specific interrogatories on this matter, as limited by the court, answered. These interroga-

tories as rephrased by the court were not answered, but rather an answer was made to the original interrogatories stating that the information could not be obtained, it being impossible to answer because the answer depended upon too many variables. After a motion by plaintiff to compel more specific answers, the court heard argument of counsel in which defendant's counsel convinced the court that the interrogatories were impossible of answer and the court denied plaintiff's motion. At trial defendant produced the official which is charged with studies of speed tape analysis, including studies of stopping times under full service and emergency brake applications. Defendant's counsel represented to the court that he was unaware of the existence of this information until the evening before because the interrogatories had been submitted to the Brake Department of the Railroad, which reported the information impossible to calculate. He stated that technically, the answers as given were true, but that information in the possession of his witness was computed from a large number of actual tape studies showing speeds of various types and make-up of trains, the time of brake application, the time when application has effect upon speed, and deceleration times and distances on service brake and emergency brake applications. Objection to the offer of this witness was made because of the prior refusal of defendant to reveal this information, even after twice being heard on objections and motions to compel more specific answers. The arguments on the motions were heard before the judge who conducted the trial and the justice of plaintiff's objection was apparent to him. Defense counsel offered his personal apology and the court does not hold him in any way personally responsible, but it must hold the railroad responsible when the information was present in its organization at the time its counsel was arguing the impossibility of determining it. The railroad has an extensive organization for the investigation of accidents, and its claims agents, through whom such requests are transmitted, must certainly be familiar with the fact that such studies are systematically made by a department of the railroad. The railroad must bear the consequences of its denial of knowledge of this information, and its evasive answers.

While the railroad argues that in the strict sense its answer given was correct as the question was first posed by plaintiff, trial counsel did not attend the argument on the objections to the interrogatories, was not aware of the court's order modifying the question, and filed the answer which asserted the inability to answer. Trial counsel was present however at the argument on the Motion to Compel More Specific Answers and is aware that the representations then made satisfied the Court that a more specific answer could not be supplied.

Rule 37 of the Federal Rules of Civil Procedure provides the consequences for refusal to make discovery. Rule 37(b) (2) (ii) provides that in case of refusal to obey an order requiring a party to answer designated questions the court may make an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing in evidence designated items of testimony. The power of the court is not limited to this remedy, it extends to the grant of rendering judgment by default against the disobedient party. The limitations on the power of the court is that the court may make such order in regard to the refusal as is just. The Court, in attempting to solve this dilemma heard the proffered testimony outside the presence of the jury, and then ordered the testimony limited.

A second reason for the exclusion of a great part of this testimony was the failure of defendant New York Central to list this witness or testimony in its pretrial procedures. In its pretrial order the court held the parties bound to the issues, exhibits and witnesses listed. Rule 16 of the Federal Rules of Civil Procedure recites that such an order controls the subsequent course of the ac-

tion unless modified at the trial to prevent manifest injustice. The court made such modification as it felt would work justice between the parties.

■ Defendant also claims prejudice because plaintiff administrator was allowed to testify when he was not listed in the pretrial narrative as a liability witness, nor was he listed as a liability witness in defendant's interrogatories asking for the names of all classes of witnesses. The critical liability testimony of plaintiff administrator was that his wife was familiar with the crossing and the erratic functioning of its signal lights.

The plaintiff was a party to the action as the administrator of both decedents. In addition he was a surviving husband of one decedent and a surviving son of the other decedent. In these relationships he was in the words of Geelen v. Pennsylvania Railroad Company, 400 Pa. 240, 161 A.2d 595, 91 A.L.R.2d 1, "Decedent's widow, while technically not a party of record in her individual capacity, was a party beneficially and directly interested." (p. 245, 161 A.2d p. 598). It was he who supplied the information in the interrogatories. He was subject to being called to testify by the opposing party and cross-examined freely as to any matter relevant and material to the issues. He was known to defendant at all times prior to the action and was subject to being deposed for discovery. The purpose of interrogatories as to the names of witnesses is to lead to the discovery of admissible evidence. We are of the opinion that the failure to list himself as a "liability witness" in answer to interrogatories or as a witness in the pretrial narrative was not a matter of calculated deception, but a natural interpretation of the word "witnesses" as meaning those whom he could call in support of his own testimony. Furthermore, the plaintiff was specifically listed by the third-party defendant in answer to an interrogatory seeking the name of liability witnesses, and was listed as a witness on the Pretrial Narrative of Third-Party Defendant. We fail to see

the prejudice to defendant. We do not hold this omission to be similar in kind or degree to defendant's failure to answer the plaintiff's Supplemental Interrogatory numbered 17, after the court had heard argument on the objection to it, had simplified and restricted it, and then ordered an answer thereto, further compounded by defendant's counsel's convincing argument that a more responsive answer was impossible to secure. The defendant railroad had a department whose special function it was to collect the type of information plaintiff was seeking.

We have considered the other reasons advanced by the railroad in support of its motion for new trial and find none which compel us to grant the motion. Those directed to the charge of the court we have partly discussed previously. Otherwise, viewing the charge as a whole, we can find no grounds for granting the motion.

Defendant's Motion for a New Trial will be denied.

### THIRD-PARTY DEFENDANT'S MOTION FOR JUDGMENT N.O.V.

The controlling question in this Motion for Judgment N.O.V. in accordance with motion for directed verdict is whether a defendant who has been found guilty of wanton and wilful negligence may enforce a right of contribution against a third-party defendant who has been found not guilty of wanton and wilful negligence.

■ In a third-party action for contribution in a Federal Court proceeding for death sustained in Pennsylvania, the Pennsylvania law governing contribution between joint tort-feasors governs. Gartner v. Lombard Brothers, 197 F.2d 53 (3rd Cir. 1952). There is no case of the appellate courts of Pennsylvania governing this question, nor has any Federal Court made a determination of what the law of Pennsylvania would be in this situation. We must, therefore, attempt to determine what the applicable Pennsylvania law would be in such a case. Erie R. R. Co. v. Tompkins, 304

U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 58 S.Ct. 860, 82 L.Ed. 1290 (1938); McClaskey v. Harbison-Walker Refractories Co., 138 F.2d 493 (3rd Cir., 1943).

■ Pennsylvania originally followed the common law rule that there was no right of contribution between joint tort-feasors. Oakdale Borough v. Gamble, 201 Pa. 289, 50 A. 971. The ancient rationale of the common law rule was that the court would not lend its aid to a wrong-doer. This rule was subject, nevertheless, to the exception that a defendant only secondarily liable for a tort might recover indemnity for the full amount which he was alleged to pay in damages from one primarily liable. Brookville Borough v. Arthurs, 152 Pa. 334, 25 A. 551 (1893). Thus, an employer, liable for the tort of his servant under the doctrine of respondeat superior, has a right of action over for indemnity against his employee, the active tort-feasor. Koontz v. Messer, 320 Pa. 487, 181 A. 792 (1935).

In Goldman v. Mitchell-Fletcher Co., 292 Pa. 354, 359, 141 A. 231 (1928), the strict rule of no contribution was discarded in Pennsylvania by judicial construction. The Court determined after reference to numerous authorities, that the rule was properly limited to those cases where there has been an intentional violation of the law, where there was personal participation, personal culpability, personal knowledge. The court held that the rule did not apply to torts where the party claiming contribution was guilty of mere negligence. In conclusion the court held:

"We are not determining that contribution always exists between joint tortfeasors; we are deciding only that, in this particular instance, if that be the result, we do not look upon it as one that is improper, unjust, or without sanction in law. There may be cases in which such outcome should not be sanctioned; they will be disposed of in the future when they are brought before us for determination." (pp. 365–366, 141 A. p. 235).

This view has also been adopted judicially by a number of jurisdictions prior to the enactment of statutory provisions allowing contribution. A summary statement of the principle relied upon by the courts of these jurisdictions was that:

"The rule which bars contribution among joint tortfeasors is not appropriately applied to joint tortfeasors guilty of nothing more than negligence; hence, there is a common law right of contribution as between such joint tortfeasors." Annot.: 60 A.L.R. 2d 1366, at p. 1377.

See George's Radio, Inc. v. Capital Transit Co., 75 U.S.App.D.C. 187, 126 F. 2d 219 (1942); Best v. Yerkes, 247 Iowa 800, 77 N.W.2d 23, 60 A.L.R.2d 1354 (1956); Hobbs v. Hurley, 117 Me. 449, 104 A. 815 (1918); Hanson v. Bailey, 249 Minn. 495, 83 N.W.2d 252 (1957); Rusch v. Korth, 2 Wis.2d 321, 86 N.W.2d 464 (1957); Blunt v. Brown, 225 F.Supp. 326 (D.C.Iowa, applying Iowa law).

"The texts and commentaries reviewing the rule are uniform in their comments that where the courts have recognized a common law right of contribution, such right is granted as between tortfeasors guilty of nothing more than negligence." See 18 Am. Jur.2d, Contribution, § 40 (p. 59); 18 C.J.S. Contribution § 11(3); Annot.: 60 A.L.R.2d 1380, § 4(c).

"As indicated in § 4(a), supra, where contribution between joint tortfeasors is permitted as a matter of common law, the courts have emphasized that a tortfeasor who is entitled to contribution is one whose injurious act was not intentional."

In 1939, Pennsylvania adopted a simple statute regulating contributions:

"Contribution shall be enforceable among those who are jointly or severally liable for a tort where, as between them, such liabilities are either all primary or all secondary." Act of June 24, 1939, P.L. 1075; 12 P.S.

§ 2081 (repealed 1951 by the adoption of the Uniform Act).

The Court in *Goldman*, cit. supra, and in Fisher v. Diehl, 156 Pa.Super. 476, 40 A.2d 912 (1944), stated that contribution should be allowed except in cases where it would be inequitable. Even after the adoption of the 1939 statute it was held:

"While the Act of June 24, 1939, P.L. 1075, 12 P.S. § 2081, provides for contribution among joint tortfeasors, it originated in equity and may be enforced by the application of equitable principles." Anstine v. Pennsylvania R. R. Co., 352 Pa. 547, at p. 549, 43 A.2d 109, at p. 110, 160 A.L.R. 981 (1945).

In 1951, Pennsylvania enacted the "Uniform Contribution Among Tortfeasors Act." Act of 1951, July 19, P.L. 1130; 12 P.S. §§ 2082–2089. § 7 of that Act provides:

"This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it."

We read this as a legislative mandate to achieve a uniform application of the law.

■■■■ Pennsylvania makes a distinction between negligence and wanton and wilful misconduct. "Of course, wanton misconduct is substantially different from simple negligence and even gross negligence, not only in degree but in kind." Geelen v. Pennsylvania R. R., 400 Pa. 240, at p. 248, 161 A.2d 595, at p. 599 (1960). The distinction is a real and not an academic one.

"If wanton misconduct is found to exist then, of course, contributory negligence on the part of the decedent cannot prevent plaintiff's recovery." Geelen v. Pennsylvania R. R., cit. supra at p. 248, 161 A.2d at p. 600.

Six jurisdictions recognized a right of contribution by judicial decisions; District of Columbia, Minnesota, Pennsylvania, Tennessee and Wisconsin. Maine recognizes it in one vicariously liable. Of these states, Pennsylvania and Wisconsin later adopted the rule by statute. Other states adopting such a rule by statute are Delaware, Georgia, Kentucky, Louisiana, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Texas, Virginia and West Virginia. The Uniform Act (1939 version) was adopted by Arkansas, Delaware, Hawaii, Maryland, New Mexico and South Dakota.

In 1955, the Conference of Commissioners on Uniform State Laws and the American Bar Association approved a new version known as the 1955 Revised Act. Their purpose, as stated in the "Commissioners' Prefatory Note, 1955 Act" was to achieve uniformity of interpretation.

"In other words, contribution among joint tortfeasors is now in effect, in one form or another, in about half of the states; but there is no uniformity. The proposed Act here submitted would supercede the 1939 Uniform Act, would reconcile the serious variations which exist and, if generally adopted, would eliminate the presently existing confusion."

Section 1(c) of the 1955 Revised Act states:

"There is no right of contribution in favor of any tortfeasor who has intentionally [wilfully or wantonly] caused or contributed to the injury or wrongful death."

The Commissioners' Note to Subsection (c) explains this provision:

"Subsection (c). Intentional, wilful and wanton. The substance of this provision is found in a few of the existing statutes, usually in rather vague language. Kentucky and Virginia, for example, provide that there must be no 'moral turpitude.' The 1939 Act was silent on the matter. The policy here followed is that of the original rule as to contribution, that the court will not aid an intentional wrongdoer in a cause of action which is founded on his own wrong. In cases of concerted battery, for example, there ap-

pears to be little reason to shift any part of the liability to another.

Two valid reasons exist for extending the exclusion to wilful and wanton acts causing or contributing to the injury.

In the first place wilful and wanton acts seem naturally to belong in the same class with intentional wrongs and to imply moral turpitude on the part of the wrongdoer. The policy of the section as drafted adopts the law of those states which do not recognize classification of negligence into degrees. It is intended to convey the idea that there is a difference between negligence and wilful and wanton misconduct. (See Srajer v. Schwartzman, 164 Kan. 1 [241], c. 248 [188 P.2d 971]).

In the second place, by excluding wilful and wanton actors from the right to contribution, we eliminate most of the arguments urged for a rule allocating the shares of liability on the basis of relative degrees of fault. (See Sec. 2).

In many states 'gross and wanton negligence' in guest statutes is construed to mean wilful and wanton conduct. This is the rule which should be applied in determining the right of contribution under this act.

Brackets have been placed around the words 'wilfully or wantonly' so that they may be omitted in those states where by definition of the terms they mean something less than they imply and where by including them the bar of the remedy would be too broad." 9 U.L.A. 1967, Supplement p. 128.

This view has been specifically adopted in Minnesota, a state which allows contribution under judicial decisions without statutory authority, and in Wisconsin which has a simple contribution statute similar to the 1939 Pennsylvania Act. The rule has been adopted by statute in North Dakota since 1957.

In Hardware Mut. Casualty Co. v. Danberry, 234 Minn. 391, 48 N.W.2d 567 (1951), the court held that a failure after discovering a peril to exercise ordinary or reasonable care to avoid impending injury constitutes wilful negligence, with respect to which no right to contribution exists.

In Rusch v. Korth, cit. supra, the Wisconsin court denied contribution to a joint tortfeasor whose conduct was wilful. Both Minnesota and Wisconsin have applied this rule in a number of cases.

In California, by statute, contribution is denied to any tortfeasor who has intentionally injured the injured person. Augustus v. Bean, 56 Cal.2d 270, 14 Cal. Rptr. 641, 363 P.2d 873.

We, therefore, conclude from the rationale of the Pennsylvania decisions allowing contribution and from the weight of authority from other jurisdictions and the commentaries, that if the question were presented to the highest appellate court of Pennsylvania the rule would be that a tortfeasor found guilty of wanton and wilful misconduct cannot enforce a right of contribution against one specifically found not guilty of wanton and wilful misconduct in the same accident.

The Motion of Third-Party Defendant for Judgment N.O.V. will be granted.