**ANDERSON**

v.

**UNITED STATES (ILLINOIS CENT. R. CO., Third-Party Defendant).**

**MARSHALL**

v.

**UNITED STATES (ILLINOIS CENT. R. CO., Third-Party Defendant).**

Civ. Nos. 635, 670.

United States District Court,
W. D. Kentucky, at Paducah.
Nov. 11, 1953.

James G. Wheeler, Wheeler & Marshall, Paducah, Ky., Lucius E. Burch, Jr., Burch, Porter & Johnson, Memphis, Tenn., for plaintiff.

Chas. F. Wood, Asst. U. S. Atty., Louisville, Ky., for United States.

Francis Goheen, Paducah, Ky., for Illinois Cent. R. Co., Inc., third-party defendant.

SHELBOURNE, Chief Judge.

Case No. 635 above was filed by plaintiff, C. Paul Anderson, against the United States, as defendant, on April 15, 1952. The plaintiff there sought to recover $25,000 on account of injuries sustained by him on the morning of April 16, 1951, while the plaintiff was a Fireman on the Illinois Central passenger train running from Memphis to North Cairo, Illinois, when the engine and boiler of the passenger train was struck by a revolving crane on a piece of heavy army equipment, known as a Link-Belt Speeder, loaded on a flat car comprising in part a freight train traveling South on a track parallel to the track on which the passenger train was proceeding north, the accident in which the plaintiff was

injured occurring a short distance south of Clinton, Kentucky.

Action No. 670 was originally filed October 10, 1952 by Della Irwin Carlson, Executrix of the Estate of Peter A. Carlson, deceased. Subsequently, Thos. J. Marshall, Ancillary Administrator of the Estate of Peter A. Carlson, under appointment by the Hickman County Court at Clinton, Kentucky, was substituted as plaintiff. in that action. Recovery was sought in the sum of $100,000 under the Kentucky Death Statute, by reason of the death of decedent Peter A. Carlson, who was the Engineer upon the passenger train upon which C. Paul Anderson, plaintiff in the pending case, was the Fireman.

In the above numbered cases, the defendant United States, with leave of Court, impleaded the Illinois Central Railroad Company, charging that the latter's negligence was the sole or contributing cause of the accident which resulted in the injuries to Anderson and in the death of Carlson, and the Government sought a recovery against the Illinois Central for all or a contributable portion of any judgment which might be rendered against it in favor of the plaintiffs.

The cases were consolidated for trial and tried to the Court without a Jury.

The Court makes the following

## Findings of Fact.

1. United States of America (hereafter called United States) owned six certain mobile cranes (hereafter called the six cranes) located at the Granite City Army Engineer's Depot (hereafter called the Army Depot) at Granite City, Illinois. The six cranes were manufactured by Link-Belt Speeder Corporation and were known as Link-Belt Speeders; were all the same model and construction; and were specifically identified by their respective serial numbers. The Army Depot was operated by the War Department of the United States; and the employees at the Army Depot were employees of the United States. The six cranes were located at the Army Depot for the preparation by the Army Depot employees of the United States for transportation to a port of embarkation and for shipment overseas.

2. While the six cranes were at the Army Depot, the United States by its Army Depot employees (a) prepared the six cranes (1) for transportation by rail from the Army Depot to the Port of Embarkation at New Orleans, Louisiana and (11) for shipment from the Port of Embarkation to an undisclosed place overseas, and (b) loaded each of the six cranes on six separate flat cars located on railroad spur tracks of the Army Depot.

3. After the United States Army Depot employees prepared the six cranes for transportation and shipment and loaded them on the six flat cars, each of the six cranes consisted of (a) one single assembled piece of equipment composed of a revolving house (or cab) mounted on a truck frame seated on a ten wheel axle base with attached truck cab and weighed 53,000 pounds and (b) certain detached crane parts, including the boom.

4. The revolving house of each of the six cranes revolved or turned on a metal rotating device or turntable by which the house was attached to the truck frame. On the inside of the revolving house of each of the six cranes, there was a mechanism and lever for the purpose of locking the rotating or turning device so that the house would remain stationary and in a fastened and secure position and would not turn. When this locking mechanism was placed in a locked position by the lever inside the cab, the locking device became engaged with the teeth of the turntable or rotating device so that the turntable and the house would not turn. When the locking mechanism was not in a locked position, the house would turn on the application of a sufficient amount of centrifugal force.

5. When the United States Army Depot employees prepared the six cranes for transportation and shipment, such employees did not lock the locking mechanism of five of the six cranes;

but, instead, prepared such five cranes for transportation and shipment with the locking mechanism unlocked.

6. Before the United States Army Depot employees loaded the six cranes onto the flat cars at the Army Depot, such employees securely sealed the doors and entrances into the revolving houses of each of the six cranes and placed the seal of the United States thereon. These United States employees sealed the entrance into the rotating houses in such a manner that a determination of whether the locking mechanism was locked or unlocked was not ascertainable without a forced opening of such entrance and by breaking of the seal of the United States.

7. After the United States Army Depot employees sealed the doors to the rotating houses of the six cranes, other United States Army Depot employees loaded the six cranes on the six flat cars on the tracks at the Army Depot. The six cranes were thereby loaded by the employees of the United States with the doors to the houses sealed and with the locking mechanisms inside the houses of five of the six cranes unlocked.

8. When the United States Army Depot employees prepared and loaded the six cranes, such employees secured the revolving houses of each of the six cranes to the truck frames by open end hooks. After the preparation and loading of the six cranes, the open end hooks were located in such a manner that they were concealed under the frame of the cranes. The use of open end hooks for securing these rotating houses to the truck frames was contrary to the rules of the Association of American Railroads of which the War Department of the United States is a member.

9. Prior to the preparation and loading of the six cranes, the United States Army Depot employees had prepared, loaded and shipped a considerable number of cranes of the same and similar type; and such employees had considerable experience in the preparation, loading and shipment of such cranes. The United States Army Depot employees knew that the preparation of these cranes for transportation and shipment with the locking mechanism in the rotating houses unlocked was dangerous; that when such locking mechanism was unlocked the rotating houses would turn upon the application of centrifugal force; and that there was always a probability that such unlocked houses would turn when the cranes were in motion under ordinary conditions of transportation.

10. After loading the six cranes on the six flat cars at the Army Depot, employees of the United States transported the six flat cars and their loads by rail with a locomotive of the United States to a point just outside the property of the Army Depot.

11. On a prepared form, headed "U. S. Government Bill of Lading", the Link-Belt Speeders were consigned by the Government at Granite City Engineer Depot to the Port Transportation Officer at New Orleans, Louisiana, the bill of lading providing, inter alia, "Pick-up service at origin was not by the Government or its agent."

The Link Belt Speeder that gave rise to this action was loaded upon G. M. & O flat car #72004, and this car was picked up at Granite City Engineer Depot by the Terminal Railroad Association and a certificate of inspection was attached to the car by William King, an Inspector for the Terminal Railroad Association, which is as follows—

"Form 176
Terminal Railroad Association
of St. Louis
Machinery—Rotary Type
Initial & Number GMO 72004 Destination Calif.
Shipper U. S. Eng. Depot
Place Granite City Date 8–1351
This is to certify that I, the undersigned, have on this date inspected the load on the above car and found it secured in accordance with Fig. 164 of the A. A. R. Loading Rules.
or
I inspected this machine, moving on its own wheels, secured in accordance

with Fig. ——— and found the propelling mechanism disengaged.
Gr. City Ill.
Point of Inspection

Wm. King
Inspector."

The Inspector William King made only a visual inspection, being unable to examine the locking device inside the houses because of the openings in the cab or houses of the Speeders being closed and locked.

The Terminal Railroad Association transported the cars, including the one in question from the Army Depot at Granite City, Illinois, to East St. Louis, where they were there delivered to the Illinois Central Railroad Company.

12. After the Illinois Central Railroad Company received the car in question, its employees made a visual inspection but did not discover any defect in the loading and the car became a part of Illinois Central freight train SN–3. Fifty cars made up train #SN–3.

The car was again inspected while it was a part of freight train SN–3 at North Cairo, Illinois, and no defect was there discovered and that train proceeded southward toward Fulton, Kentucky.

13. A short distance south of Clinton, Kentucky, and about 2:20 o'clock A.M. August 16, 1951, freight train SN–3 met Illinois Central passenger train #16, known as the "Chickasaw" proceeding northward on its scheduled trip from Memphis to St. Louis.

Freight train SN–3 was on the western track and the "Chickasaw" on the east or north-bound track. As the two trains attempted to pass, the rotating house of a crane loaded on GM&O car 72004 had rotated and turned so that the crane struck the left side of the locomotive of the "Chickasaw". There were five other cranes loaded with Link Belt Speeders on train SN–3 and a subsequent examination showed that the rotating houses on four of the cranes had become partially on one of the cranes only had been lock-unsecured and that the rotating house

ed and that particular crane was in position and locked.

14. At the time of the collision between the crane on GM&O car 72004 and the passenger train #16, Peter A. Carlson was the Engineer and C. Paul Anderson was the Fireman on the passenger train. In the collision, the steam pipes on the locomotive of the "Chickasaw" were so damaged and broken that steam and boiling water poured into the cab of the locomotive, scalding and burning Peter A. Carlson, so that he died within a few hours thereafter, and C. Paul Anderson sustained injuries which will be hereinafter described.

15. There was no proof of any rough or unusual handling of train #SN–3 on its trip from the Army Depot at Granite City, Illinois, to the place of the accident.

Neither the inspection at East St. Louis nor the inspection at North Cairo revealed any defect about any of the cars in which the Link Belt Speeders were loaded nor was any misplacement of any of the cranes noted by the Inspectors. Neither of those inspections disclosed the locking mechanism inside the houses of the Link Belt Speeders to be unlocked nor the houses to be fastened to the frames by rods with open end hooks.

16. The collision between the crane of the Link Belt Speeder loaded on GM&O car 72004 and the engine of the passenger train, and the resulting death of Carlson and the injuries to Anderson were caused by the fact that the locking mechanism of the rotating houses on the crane of GM&O car 72004 had not been locked, so as to prevent turning or rotating while in transit.

In the inspection report of King, his certificate, copied above, was attached to the GM&O car 72004 and reference is made to Figure 164 of the "AAR Loading Rules." Figure 164 relates to "Rotating Shovel, (Truck Chassis) Having Pneumatic Tires—Flat Cars" and contains a detailed drawing of the proper method of preparing rotating shovels for

shipment and refers to General Rules for further details.

Rule 19, Pamphlet No. MD–5 of the Association of American Railroads, in the General Rules, provides—

"Machinery, Rotary or Swinging Type—Inspection and Carding.—Machinery (including covered machinery), of this type, such as cranes, derricks, steam shovels, mining, etc., due to extraordinary hazards in transporting, whether loaded on cars or moving on its own wheels, the rotating or swinging portions, including booms, extensions, etc., must be secured in accordance with A. A. R. Loading Rules. This security must be certified to by an authorized inspector who shall fill out two cards, of the form printed below, and attach one card to each side of machine moving on its own wheels, or to each side of car upon which machine is loaded."

17. The Agents of the United States at the Army Depot at Granite City, Illinois, negligently failed to lock securely the rotating cab of the Link Belt Speeders loaded on GM&O car 72004 and in closing the windows and openings of the cab so that a more detailed inspection of the device for locking the rotating cab could not be made without prying open the inclosures placed upon the doors and windows.

18. The Illinois Central Railroad Company was negligent in receiving for transportation the Link Belt Speeder loaded on GM&O car 72004 without having determined by an actual inspection that the rotating cab on the machine had been securely locked so as to prevent the cab thereafter from rotating.

19. Peter A. Carlson, at the time of his death, was sixty-three years of age, was earning $6,500 per year, exclusive of income taxes, and had a life expectancy under the Wigglesworth Table of Mortality of 13.66 years. He is shown to have been an experienced, dependable Engineer of good habits and in good health.

20. C. Paul Anderson, the Fireman, by reason of the burns and injuries sustained by him in the accident, was totally disabled from August 16, 1951, to December 31, 1951, and is now and will be permanently disabled to the extent of twenty percent. His monthly earnings, exclusive of income taxes, were $467.94. He was fifty-three years of age, with a life expectancy under the Wigglesworth Table of 19.49 years, was in excellent health and an experienced locomotive Fireman.

### Conclusions of Law.

I. The two actions here consolidated were each filed under the provisions of, and jurisdiction exists under the Federal Tort Claims Act, 28 U.S.Code, § 1346(b).

II. The Court has jurisdiction of the third-party defendant and the cause of action set up against it by the original defendant and third-party plaintiff. United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523; Di Benedictis v. United States, etc., D.C., 103 F.Supp. 462.

III. The agents and employees of the United States at the Army Depot at Granite City, Illinois, negligently and carelessly prepared the Link Belt Speeders, including the Speeder loaded on GM&O car 72004, in failing to engage the locking mechanism which was designed to prevent the rotating of the cab or swinging of the crane, which was part of the Speeder, and negligently failed to prepare for shipment and loading the Link Belt Speeder here in question, as required by the Rules of the Association of American Railroads.

IV. The Illinois Central Railroad Company received the Link Belt Speeder loaded on GM&O car 72004 without ascertaining that said Speeder had been loaded in accordance with the Rules of the Association of American Railroads and without ascertaining before transporting said car over its line of railroad that the cab and rotating mechanism on the Link Belt Speeder had been securely locked and fastened and issued the certificate of inspection which its Agent

504

William King signed and attached to GM&O car 72004.

The transportation of the Link Belt Speeders by railroad with the locking mechanism not engaged so as to prevent the rotating or turning of the cab constituted a peril in transportation and created great danger to employees on trains on tracks parallel and adjacent to the track on which train SN-3 was traveling.

■■ V. The negligence of the employees of the United States at the Army Depot at Granite City, Illinois, above set forth and the negligence of the Illinois Central Railroad Company in receiving for transportation and in transporting said car without having first ascertained that the rotating cab had been securely locked concurred to bring about and constitute the direct and proximate cause of the collision between said rotating cab of the Speeder loaded on GM&O car 72004 and the engine of passenger train No. 16 and the resulting injuries and death of Peter A. Carlson and injuries of C. Paul Anderson.

■ VI. The plaintiff Thos. J. Marshall, Ancillary Administrator of Peter A. Carlson, deceased, is entitled to recover in this action on account of loss of the life of Peter A. Carlson, resulting in the destruction of his earning power in the sum of $25,000.

■ The plaintiff C. Paul Anderson, on account of loss of time, pain and suffering and impairment of his earning power is entitled to recover $7,500. The recoveries here allowed to the plaintiffs are against the United States.

■ VII. The United States is entitled to recover, on account of the contributing negligence of the Illinois Central Railroad Company, against the Illinois Central Railroad Company, fifty percent of the amount awarded to the respective plaintiffs against the United States. United States v. Yellow Cab Co., supra; Di Benedictis v. United States, etc., supra.

Judgments in accordance with the findings of fact and conclusions of law will be submitted by Counsel on notice.