668 P.2d 73

**Pamela K. MASTERS, Plaintiff,**

v.

**STATE of Idaho, Michael Brink and Jane Doe Brink, husband and wife, Respondents-Defendants and Cross-Plaintiffs,**

and

**Roger Griesmer and Lydia Griesmer, husband and wife, Appellants-Defendants and Cross-Defendants.**

No. 13357.

Supreme Court of Idaho.

Feb. 25, 1983.

Rehearing Denied Sept. 8, 1983.

Kenneth B. Howard of Hannon, Gabourie & Howard, Coeur d'Alene, for appellants-defendants and cross-defendants.

Robert M. Tyler, Jr. of Elam, Burke, Evans, Boyd & Koontz, Boise, for respondents-defendants and cross-plaintiffs.

SHEPARD, Justice.

This is an appeal by defendants-appellants Griesmer from a judgment awarding contribution against them and in favor of the respondents-defendants State of Idaho and Michael and Jane Doe Brink. We affirm.

The principal action was one for personal injury damages arising from a collision between a motorcycle and an Idaho State police patrol car. Plaintiff Masters was a passenger on the motorcycle owned and driven by Roger Griesmer. Michael Brink was an Idaho State Police Officer and the operator of a state police patrol car. Brink was pursuing the Griesmer-driven motorcycle, which was traveling at a speed of approximately 90 miles per hour. When Brink observed Griesmer make a U-turn, and start back toward him, Brink stopped the patrol car, blocking the highway and the motorcycle collided with the patrol vehicle.

Masters was injured in the accident and filed suit against the Griesmers, the State

of Idaho, and the Brinks. Upon trial, the state moved for a directed verdict in its favor on the basis that the acts of Brink fell within "a discretionary function or duty on the part of a governmental entity or an employee thereof" and hence there was no liability on the part of either the state or its employee. *See* I.C. § 6–904(1). Both plaintiff Masters and defendants Griesmer opposed the motion with extensive briefing and argument. The trial court denied that motion. No appeal was taken from that ruling.

The jury found that the defendant, Griesmer, was negligent and that his negligence proximately caused the collision. Ninety-five percent of the causal negligence was assigned to Griesmer. The jury also found the State of Idaho and its employee Brink were negligent and that their negligence proximately caused the collision. The jury attributed 5% of the causal negligence to the State of Idaho and Brink. The jury found that the plaintiff Masters was not negligent and assessed her damages at approximately $97,000. The trial court entered judgment accordingly, finding all defendants jointly and severally liable. No appeal was taken therefrom by any of the parties.

Thereafter, Griesmers paid $10,000 on the judgment, and the State of Idaho paid the remaining approximately $87,000. The State of Idaho had in its cross-claim asserted that in the event a judgment was entered against it that it in turn would seek contribution from the Griesmers. Since judgment had been entered against the state, it moved for summary judgment for contribution against the Griesmers asserting that the state had paid approximately $82,000 in excess of the state's proportional share of the liability. That motion for summary judgment was granted and the Griesmers appeal therefrom.

█ Griesmers first argue that the state is not a joint tortfeasor within the meaning of I.C. § 6–803 because it does not share a "common liability" with the Griesmers and hence the state is not entitled to contribution. I.C. § 6–803 provides:

"6–803. Contribution among joint tortfeasors—Declaration of right—Exception—Effect of comparative negligence. —(1) The right of contribution exists among joint tortfeasors, but a joint tortfeasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.

"(2) A joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement.

"(3) When there is such a disproportion of fault among joint tortfeasors as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares solely for the purpose of determining their rights of contribution among themselves, each remaining severally liable to the injured person for the whole injury as at common law.

"(4) As used herein, 'joint tortfeasor' means one (1) of two (2) or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them."

By statutory definition, the state here is clearly a "joint tortfeasor" since the action was brought against both the state and Griesmers and judgment thereon was rendered against both, holding them jointly and severally liable in tort for the same injury to Masters. The Griesmers argue, however, that certain limitations statutorily placed upon the liability of the state result in the state standing on a different footing than do the Griesmers and hence the state and the Griesmers do not share a "common liability". We disagree.

█ To the extent that sovereign immunity has been abrogated by the state, it has subjected itself to liability for its negligent acts and the negligent acts of its employees,

and to that same extent, the state shares a common liability with third party private tortfeasors. The instant case is an example thereof. Under the federal tort claims act (after which our state tort claims act was evidently patterned) and many state tort claims acts which contain some or all of the exceptions contained in the Idaho tort claims act, it has been held that governmental entities may both sue and be sued for contribution. *United States v. Yellow Cab,* 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951); *Anderson v. United States,* 118 F.Supp. 498 (W.D.Ky.1953); *Di Benedictis v. United States,* 103 F.Supp. 462 (W.D.Pa. 1952); *Petersen v. City and County of Honolulu,* 51 Hawaii 484, 462 P.2d 1007 (Hawaii 1970); *Nelson v. State,* 105 Misc.2d 107, 431 N.Y.S.2d 955 (Ct.Cl.1980).

Contribution is a remedy deeply rooted in the principles of equity, fair play and justice. *Aalco Manufacturing Co. v. City of Espanola,* 95 N.M. 66, 618 P.2d 1230 (N.M.1980); *Larsen v. Minneapolis Gas Co.,* 282 Minn. 135, 163 N.W.2d 755 (Minn.1968); *Panichella v. Pennsylvania Railroad Co.,* 167 F.Supp. 345 (W.D.Pa.1958), reversed in part on other grounds, 268 F.2d 72 (3d Cir.1959), *cert. denied,* 361 U.S. 962, 80 S.Ct. 590, 4 L.Ed.2d 543 (1960). We see no equity in the result sought by the Griesmers who would require that the state be held liable for approximately 90% of Masters' damages, 95% of which resulted from the causal negligence of Griesmers. Neither our tort claims act nor our statutes governing contribution among joint tortfeasors contain any indication that the state is prohibited from obtaining contribution from a joint tortfeasor. The clear language of the statute dictates a contrary result.

Griesmers next argue that the state acted as a volunteer in satisfying the judgment in favor of Masters to the extent of $82,000 and therefore the state is not entitled to contribution. Such assertion, of course, flies in the face of the judgment entered in favor of Masters and jointly and severally against the state. The Griesmers, however, argue that Officer Brink was performing a discretionary function of government at the time of the accident, and therefore the state was immune from liability, *see* I.C. § 6–904(1), and hence any payment made by the state was voluntary and one for which it cannot now seek contribution. The record is clear that the defense of the discretionary function exception to the state's liability was asserted by the state at trial, was resisted by the Griesmers, that the state's position was the subject of an adverse ruling by the trial court, that the ruling of the trial court favored the Griesmers, and no appeal from that ruling was taken by any party. The Griesmers may not have their cake in the trial court and then regurgitate it here. A party will not be heard to prevail upon an issue below, and then on appeal, in effect, seek an overruling of the favorable decision. *Heckman Ranches, Inc., v. State,* 99 Idaho 793, 589 P.2d 540 (1979); *Ford v. Lord,* 99 Idaho 580, 586 P.2d 270 (1978); *Frasier v. Carter,* 92 Idaho 79, 437 P.2d 32 (1968).

Although, as found by the trial court, "this entire case was tried by the parties and presented to the jury on the issue of negligence of all of the Defendants and the jury determined the percentage of negligence of each", nevertheless, the Griesmers now seek to inject an issue of an intentional tort on the part of Officer Brink and thereby prohibit an "intentional" tortfeasor from obtaining contribution from a tortfeasor who is merely negligent. The trial court found "such an issue [intentional tort] was never presented in this case, and cannot be raised at this time [motion for summary judgment on the issue of contribution]." The record indicates the finding of the trial court is clearly correct. The parties will be held to the theories upon which a cause was tried in the court below. *Heckman Ranches, Inc. v. State, supra; Ford v. Lord, supra; Frasier v. Carter, supra.*

The judgment of the trial court is affirmed. Costs to respondents. No attorney's fees on appeal.

DONALDSON, C.J., BAKES, J., and McFADDEN, J. (Ret.), concur.

BISTLINE, Justice, dissenting.

## I.

Here we have a sequel to *Odenwalt v. Zaring,* 102 Idaho 1, 624 P.2d 383 (1980), wherein the split on the Court was three-to-two. By a single vote the lot of tort victims in the State of Idaho was thrown in with that of Wisconsin's tort victims, notwithstanding that the legislature expressed no intent whatever that such should happen. It was said, however, by the three-member majority that the I.C. § 6–801, "enacted in 1971, is virtually identical to the Wisconsin comparative negligence statute in effect in 1971." 102 Idaho at 4, 624 P.2d at 386. Upon that slender premise of a "virtually identical" statute, the majority simply declares that "we should follow the interpretation which the Wisconsin Supreme Court had placed upon their comparative negligence statute prior to 1971." 102 Idaho at 5, 624 P.2d at 387. The majority opinion seemingly fortified its holding by declaring itself "bound by the intent of the legislature," 102 Idaho at 6, 624 P.2d at 388, and finds "legislative intent [is] readily ascertainable" because of the assumed "adoption of the Wisconsin comparative negligence statute . . . ." *Id.* at 6, 624 P.2d at 388. Notwithstanding that the two-member dissenting opinion in *Odenwalt* made a complete shambles of the arbitrary and unfounded assumptions indulged in by the majority to attain the result reached, 102 Idaho at 6, 624 P.2d at 388, not one of the three members who comprised the majority deigned to make any response. Such does not demonstrate good appellate practice.

After the *Odenwalt* opinion was released, and petition for rehearing was filed, the Court received amicus briefs from the Idaho Trial Layers Association and from the Idaho Association of Defense Counsel. These briefs were not merely onesided endorsements of, respectively, the dissenting and majority opinions and the views espoused by the litigants, but were well-reasoned presentations of the issue at stake—to wit, a proper determination as to whether the 1971 Idaho legislature can be said to have intended that a plaintiff's contributing negligence might still act as a bar precluding recovery from a given tortfeasor. The issue presented was extremely important. On the first go-around the Court had the benefit of only the briefs of the parties, who naturally advocated contentions favoring their purses. That is not to say that the briefs, and oral argument as well, were not well done. They were well done. It is to suggest, however, that here there was far more at stake than just the question of whether Odenwalt was entitled to have his judgment run against Zaring—but at stake was a question of law vital to the entire state. It must be remembered that in the ten years following the enactment of House Bill No. 265 into law [1], the question had not arisen, presumably either because a proper factual context had not arisen, or, and a more likely probability, because legal minds observed that the caption to House Bill No. 265 declared that its purpose was to do away with the archaic plea in bar of contributory negligence:

"PROVIDING THAT CONTRIBUTORY NEGLIGENCE SHALL NOT BAR RECOVERING OF DAMAGES FOR NEGLIGENCE OR GROSS NEGLIGENCE RESULTING IN DEATH OR INJURY TO PERSON OR PROPERTY BUT PROVIDING THAT ANY DAMAGES ALLOWED BE DIMINISHED IN PROPORTION TO THE AMOUNT OF NEGLIGENCE OR GROSS NEGLIGENCE ATTRIBUTABLE TO THE PERSON RECOVERING;"

To most practitioners, and I would believe to scholars as well, it has been as clear as the proverbial nose on Dooley's face that the "person recovering" would no longer forfeit all right of recovery because of any degree of contributory negligence, but his damages would be diminished. Such was

---

1. The Governor approved the legislation March 24, 1971. The three-member majority did not decimate section 1 (codified as I.C. § 6–801),

until ten years later, lacking seven days, March 17, 1981.

the caption of House Bill No. 265. The body of the House bill, as written in section 2, required the tort victim's negligence to be less than that of the tortfeasor's. The entire balance of the 1971 Act dealt with situations where the injured plaintiff had claims against more than one tortfeasor, and detailed the procedures for effecting contribution amongst them.

With that in mind, and conceding the creation of at least a problem by section 1's omission of an "s" on the word "person," in referring to a defendant being sued, but with due regard for the magnitude of the issue, and the court being decided three-to-two, it is unbelievable that a rehearing was not allowed and the matter reconsidered with the benefit of amicus briefs and oral argument. It was not to be. The three members of the Court who comprised the majority simply stone-walled the petition; the opportunity for an enlightening rehearing was turned away. One single vote by any one of the majority would have at least displayed an open and receptive attitude of the Court, and on a rehearing the entire state would have been the beneficiary.

One section, just one and one only, of the 1971 Act, dealt with comparative negligence, which fact was brought to the majority's attention in the dissenting opinion, 102 Idaho at 7, 624 P.2d at 389. Yet the majority, without responding to such, simply stood pat on its declaration that the Idaho legislature in 1971 was adopting the Wisconsin act. This it does, notwithstanding that there is, other than for section 1, no Wisconsin legislation dealing with contribution amongst tortfeasors, which comprises the most part of the Idaho 1971 legislation. It was the Wisconsin court, not the legislature, which provided for contribution among tortfeasors. *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962).

## II.

Today, at least, in applying the legislature's 1971 Act, no one on the Court is heard to urge that we must be guided by Wisconsin. Today, unlike *Odenwalt* the Court properly indulges in its own reasoning as to the meaning and application of the legislative language. This is as it should be, and as it should have been in *Odenwalt.* The rationale of the Court's opinion, if I correctly understand it, is that, under I.C. § 6–803,[2] contribution shall be determined simply by applying the percentages of negligence. Such an approach does have the virtue of simplicity, and it may be correct, but if so, I am greatly troubled that the statute does not so provide in rather easily stated language. On the contrary, the statute is couched in terms of "inequitable," "equal distribution" by contribution, "relative degrees," "fault," and "determining their pro rata shares." This, to my mind, suggests more than a mechanical application of jury-determined percentages. If one accepts the simplistic approach, then there is really no need for judicial action whatever—the clerk of the court can as easily apply percentages against damages as can a judge.

2. I.C. § 6–803 provides:
"6–803. Contribution among joint tortfeasors—Declaration of right—Exception—Effect of comparative negligence.—(1) The right of contribution exists among joint tortfeasors, but a joint tortfeasor is not entitled to a money judgment for contribution until he has by payment *discharged the common liability* or has paid more than his pro rata share thereof.
"(2) A joint tortfeasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tortfeasor whose liability to the injured person is not extinguished by the settlement.
"(3) When there is such a disproportion of fault among *joint tortfeasors* as to render inequitable an equal distribution among them of the common liability by contribution, the relative degrees of fault of the joint tortfeasors shall be considered in determining their pro rata shares solely for the purpose of determining their rights of contribution among themselves, each remaining severally liable to the injured person for the whole injury as at common law.
"(4) As used herein, 'joint tortfeasor' means one (1) of two (2) or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against *all or some of them.*" (Emphasis added.)

With such in mind, and turning to the facts of the instant case, it would seem that the statute contemplates judicial intervention in passing upon the question of contribution. Here the jury did assess only five percent negligence to the police officer. Probably, one would surmise, not because the officer's conduct was not grossly negligent and even intentional, but because the underlying cause was the speeding motorcycle—even though it was not speeding when the officer, in what has to be gross disregard of the motorcycle passenger's life and safety, abruptly placed two tons of steel and glass directly in its path. Juries are more often right than wrong, but we ought not shut our eyes to the fact that juries do go awry. *See,* for example, *Odziemek v. Wesely,* 102 Idaho 582, 634 P.2d 623 (1981); *Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575 (1979); *Bentzinger v. McMurtrey,* 100 Idaho 273, 596 P.2d 785 (1979); and *Seppi v. Betty,* 99 Idaho 186, 579 P.2d 683 (1978).

Trial courts, and sometimes appellate courts as well, properly correct jury misfunctions. In the same vein, I incline strongly to the view that contribution among tortfeasors is a matter for judicial application and discretion, and not a mere exercise in arithmetic.

With that backdrop, I submit that there is merit in the Griesmers' second issue, as set forth in their brief:

"Does the intentional act of the State's employee, Michael Brink, which contributed to the injury of the Plaintiff cut off the Respondents' right to seek contribution from the Appellants?"

The Griesmers' brief sets out this testimony of the investigating officer:

"Q. My question I am asking about the physical events that happened, Dave, are were you able to determine from talking to the driver physically how his car got to where it was?

"A. Yes.

"Q. Then please tell us.

"A. He drove it there.

"Q. Did you find any indication that it was driven there other than intentionally by the officer?

"A. No."

Appellant's Brief, p. 13.

Questioned about vehicle speed, the investigating officer said this:

"Q. Did you make a determination as to how fast the Idaho State Patrol vehicle might have been going at the time of impact?

"A. If he was going any speed at all, I would say one or two miles per hour. . . .

"Q. Is there any reason why you put down two miles per hour as opposed to zero?

"A. No, not particularly. Well, other than Mr. Brink's statement.

"Q. Did he acknowledge to you he was still in motion at the time of impact?

"A. The way that he acknowledged to me is he felt it was a transaction where everything happened at the same time. He was stopping at the same time the vehicles collided and everything else, so to speak.

"Q. Ok. And you must have assumed it was moving because you put down two miles per hour?

"A. All I put down upon what Mr. Brink told me."

Appellants' Brief, pp. 13–14.

The State patrolman confirmed in his testimony the testimony given by the investigating officer:

"Q. Ok. Now, you say you were about 100 yards back when he commenced his u-turn?

"A. Yes, back in this area here (indicating).

"Q. And what did you do then?

"A. Once I saw the motorcycle make the u-turn into this area, I pulled across the highway approximately as this diagram shows.

"Q. And you just pulled across the center line and stopped right there?

"A. Well, at the time of impact I was either stopped or almost stopped; I can't recall exactly.

. . . .

"Q. What was your purpose in performing this maneuver?

"A. It was my intention to block his escape route so he would stop."

Appellant's Brief, pp. 14–15.

The State patrolman did not deny that he knew there was a passenger aboard the motorcycle, and gave his weird view that she could get off, or otherwise become part of the crime, notwithstanding that the alleged crime of the driver's earlier speeding had come to an end and the motorcycle was no longer speeding:

"Q. Ok. In other words, on July 16th, then you thought you could use a high risk procedure to stop Mr. Griesmer and ignore the danger to the passenger so that you could keep people down the road safe? What public are you protecting?

"A. The people down the road.

"Q. What about the passenger on the motorcycle?

"A. Well my understanding of that is the passenger in any vehicle has the opportunity or can refuse the ride, get off, refuse to be with the violator. Therefore, she becomes part of the crime.

. . . .

"Q. Now, is it your testimony, Officer Brink, that you felt on July 16, 1976, you owed no duty to Pam Masters as far as her safety?

"A. I really don't know how you mean that.

"Q. Well, to the best of your recollection, on July 16, 1976, immediately prior to turning into the oncoming traffic lane and even going past the fog line, are you telling us it's your opinion that you owed no duty of care to her or to the motorcycle driver because they had been speeding down the road further?

"A. No, that's not true.

"Q. What duty do you think you owe to her as a passenger?

"A. Trying to get her stopped or get them stopped.

"Q. Is turning into an oncoming lane of traffic, in your opinion, an endangering act?

"A. In some cases, yes."

Appellants' Brief, pp. 15–16.

The jury, of course, was not called upon to indulge in distinctions between willful or wanton negligence and ordinary negligence. Such matters have been, and are better suited, for a court's determination. The jury, as best it could, apportioned causal negligence.

The Griesmers bring to our attention a recent case from the Wyoming Supreme Court which appears to be nearly on all fours with the facts of this case. Wyoming statutes on contribution are generally much like Idaho's, but in addition to a provision identical to I.C. § 6–803, there is a provision which explicitly provides:

"There is no right of contribution in favor of any tortfeasor who has intentionally, willfully or wantonly caused or contributed to the injury or wrongful death."

Wyo.Stat. § 1–1–110 (1977).

The Wyoming court noted, as have I, that under comparative negligence statutes "the jury must determine the percentage of negligence attributed to each party, rather than the broad categorizations of 'ordinary negligence' and 'gross negligence.'" *Danculovich v. Brown*, 593 P.2d 187, 192 (Wyo. 1979). Although there were not two defendants in that case, and the question arose between the plaintiff and the sole defendant, the court's legal conclusions do apply where the issue arises between two tortfeasors, as here. That which, here in Idaho, the statute refers to as inequitable, because of the proportion of fault, is that which the Wyoming statute calls intentional, willful, or wanton negligence. The Idaho language, "proportion of fault," which is the issue in resolving claims of contribution, is hinged on ascertaining the equities—hence, "inequitable" is not simply determined by a mere repetition of jury-formed percentages. The Wyoming court understands this:

"But the category of 'willful and wanton' misconduct can not be likewise relegated to obsolescence by the advent of comparative negligence. While 'ordinary' and 'gross' negligence differ in degree,

'ordinary' negligence and 'willful and wanton' misconduct differ in kind. In apportioning the degrees of negligence between the parties, *a jury will no longer be concerned with the point at which ordinary negligence becomes gross. It will consider the relativity of negligence from 0 degree to 100 degrees. But, this apportionment does not concern the difference in the kind of conduct which distinguishes negligence from willful and wanton misconduct. Willful and wanton misconduct, in the strict sense, is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative.*

" ' " ' * * * Willful negligence involves the element of conduct equivalent to a so-called constructive intent.' " '

" ' " * * * Ordinary and gross negligence differ in degree of inattention, while both differ in kind from willful and intentional conduct which is or ought to be known to have a tendency to injure." '

* * * * * *

" ' * * * "Willful misconduct is the intentional doing of something which should not be done, or intentional failure to do something which should be done, in the operation of the automobile, under circumstances tending to disclose the operator's knowledge, express or implied, that an injury to the guest will be a probable result of such conduct. It differs from negligence, even gross negligence, although it may include gross negligence, and involves a distinct positive element as distinguished from the merely negative element of negligence or carelessness. It is willfully designed to accomplish a specific result, and is not aimless of purpose or regardless of results." ' *Mitchell v. Walters, supra* [55 Wyo. 317], 100 P.2d at [102] 106–107.

"See 65 C.J.S. Negligence § 9(1)(c).

"The intent in willful and wanton misconduct is not an intent to cause the injury, but it is an intent to do an act, or an intent to not do an act, in reckless disregard of the consequences, and under such circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another. *Mitchell v. Walters, supra;* and 57 Am.Jur.2d, Negligence, § 101, p. 707.

"Ordinary contributory negligence has not precluded recovery where defendant's conduct is wanton or willful. *Mitchell v. Walters, supra;* and *Sanders v. Pitner* [508 P.2d 602], *supra.*"

*Danculovich v. Brown,* 593 P.2d at 193 (Wyo.1979) (emphasis added) (footnotes omitted).

Other authority furnished by the Griesmers which discussed the equitable (otherwise, inequitable, as per Idaho's statute) principles attendant to distributing shares of common liability to a plaintiff, in connection with Pennsylvania Act is *Rubright v. International Harvester Co.,* 358 F.Supp. 1388 (Pa.1973):

"Representative of the cases the defendant cites is *Cage v. New York Central R.R. Co.,* 276 F.Supp. 778 (W.D.Pa. 1967). In *Cage,* after tracing the genesis and evolution of the right to contribution, Judge Weber interpreted the Pennsylvania Uniform Contribution Among Joint Tortfeasors Act so as to hold that the act embodies equitable principles and that equity will not allow a wanton and wilfully negligent party to extract contribution from a party that is merely negligent. The *Cage* ratio decidendi being that where one tortfeasor is more culpable in the moral sense than another, equity prefers that the burden of making the injured party whole fall upon the tortfeasor with the more onerous type of 'guilt.' "

358 F.Supp. at 1398.

"The Pennsylvania Uniform Contribution Among Joint Tortfeasors Act embodies a policy which favors spreading the cost of compensating an injured party for his injuries among the parties who cause those injuries. The general application of this policy serves the best interests of

justice. We agree with the decision expressed in *Cage* to the effect that the equitable principle of contribution should not be used to transfer part of the obligation to pay compensation from a party that has acted quasi intentionally so as to do a wanton and wilfully negligent act to a party that was merely negligent."

358 F.Supp. at 1400.

There should be no genuine doubt but that principles of equity and inequity will *govern* claims for contribution, all other things being equal. In fact, counsel for the State at oral argument, in concluding his presentation, declared that "contribution is an equitable concept. In fact, the term equitable is used in the statute, 6–803, subsection 3." But he immediately went on to add: "It's appropriate to allocate loss in the way of our comparative negligence system, as we do, in terms of percentages of cause of negligence." I am unable to see how the last premise is said to follow the first, but am persuaded that the "inequitable" language of our Idaho statute brings into play considerations of active and passive negligence which are only properly before a judge on a claim of contribution, not matters of jury concern.

That counsel was right in ascribing equitable origins to the doctrine of contribution is fortified by the Wisconsin Supreme Court. Prior to *Bielski v. Schulze,* 16 Wis.2d 1, 114 N.W.2d 105 (1962), the *judicially* created doctrine of contribution amongst joint tortfeasors was applied on a *pro rata* basis, i.e., the amount of a plaintiff's damages apportioned *equally* amongst the tortfeasors, or, as better worded in *Bielski:*

> "The crux of the question is whether the present automatic method of determining the number of equal shares between the number of joint tortfeasors involved is as equitable and as just a determination of contribution as determining the amount of the shares in proportion to the percentage of causal negligence attributable to each tortfeasor."

114 N.W.2d at 108.

The *Bielski* court explained how numerical pro rata apportionment had come about, comparing its history of judicial legislation to that of other jurisdictions:

> "The doctrine of contribution is an equitable doctrine based on natural justice and well recognized in suretyship and other areas of the law before it was adapted to negligence. As applied in contracts, equality was equity, either on an implied promise of such reimbursement or because of the nature of the liability for the debt. See *Estate of Ryan* (1914), 157 Wis. 576, 147 N.W. 993, L.R.A. 1917A 443. Naturally, the prorata share concept, being part and parcel of the doctrine, was used when the doctrine was applied in the field of negligence. At the time of this transition, negligence was not determined on a comparative basis, and two or more negligent tortfeasors stood in equal relation to each other as co-debtors did. *Palmer v. Wick and Pulteneytown Steam Shipping Co., Ltd.* (1894), A.C. 318.

> "Wisconsin, at a relatively early date, took the forward step by judicial decision and recognized contribution between negligent tortfeasors in *Ellis v. Chicago & N.W.R. Co.* (1918), 167 Wis. 392, 167 N.W. 1048. Even today, Wisconsin is among the minority of states which, by court decisions, recognizes the doctrine of contribution in negligence cases, although some 20 states, by legislation, have adopted the rule for general application to negligent cases or for more limited purposes. No other state has determined contribution on a comparative negligence basis by judicial decision, but by legislation, some states have done so in adopting the 1939 Uniform Contribution Among Tortfeasors Act. 9 U.L.A. 233."

114 N.W.2d at 108.

After lengthy discussion of the pros and cons, the Wisconsin court modified its earlier rule to conclude that:

> "If the doctrine is to do equity, there is no reason in logic or in natural justice why the shares of common liability of joint tortfeasors should not be translated into the percentage of the causal negli-

gence which contributed to the injury. This is merely a refinement of the equitable principle. It is difficult to justify, either on a layman's sense of justice or on natural justice, why a joint tortfeasor who is 5% causally negligent should only recover 50% of the amount he paid to the plaintiff from a co-tortfeasor who is 95% causally negligent, and conversely why the defendant who is found 5% causally negligent should be required to pay 50% of the loss by way of reimbursement to the co-tortfeasor who is 95% negligent." 114 N.W.2d at 109.

The example used is almost prophetic in light of the Griesmer situation—where the jury's assessment of percentages was exactly that of the example. A quick distinction, however, is that the example assumes a *common liability,* which is very much a question in the case at bar. It is also the Wisconsin court's modification of *its own judicial doctrine,* whereas in the Griesmer case we are obliged to interpret and apply the legislative doctrine—which to my mind the Court today avoids—taking the far easier route of mechanically applying the jury-found percentages of negligence. Jury determinations of percentages have nothing whatever to do with equity, nothing whatever. Equitable and inequitable propositions are court concerns, and it will be an interesting day indeed when jurors are instructed that their verdicts can turn on what they perceive as doing equity.

I have endeavored to illustrate that the Court today simply does not live up to its responsibility in the summary disposition of this case. We have before us an enormous problem—one which requires the utmost of collegial research and reasoning. Other courts have wrestled with the problem presented—all in recent times. Having read much, I do not profess to know what might be the eventual answer were the Court to give the matter the consideration it both requires and deserves, and in other states has received. *Herrero v. Atkinson,* 227 Cal.App.2d 69, 38 Cal.Rptr. 490 (1964); *Arctic Structures, Inc. v. Wedmore,* 605 P.2d 426 (Alaska 1979); *Celotex Corp. v. Campbell Roofing & Metal Works, Inc.,* 352

So.2d 1316 (Miss.1977); *Kennedy and Cohen, Inc. v. VanEyck,* 347 So.2d 1085 (Fla. Dist.Ct.App.1977); *State v. County of Sullivan,* 54 A.D.2d 29, 386 N.Y.S.2d 253 (App. Div.1976); *Graphic Arts Mutual Insurance Co. v. Bakers Mutual Insurance Co.,* 58 A.D.2d 397, 397 N.Y.S.2d 66 (App.Div.1977); *United Airlines, Inc. v. Wiener,* 335 F.2d 379 (9th Cir.1964), *cert. denied,* 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1965) (explaining distinction between indemnity and contribution); *Lahocki v. Contee Sand & Gravel Co.,* 41 Md.App. 579, 398 A.2d 490 (Md.Ct. Spec.App.1979) (pro rata will continue to mean "in numerical shares or proportions based on the number of tortfeasors"); *Licenberg v. Issen,* 318 So.2d 386 (Fla.1975); *Pachowitz v. Milwaukee & Suburban Transport Corp.,* 56 Wis.2d 383, 202 N.W.2d 268 (Wis.1972) (a distinction can be made between active negligence and passive negligence, but the dividing line is blurred); *Iowa Power & Light Co. v. Abild Construction Co.,* 259 Iowa 314, 144 N.W.2d 303 (Iowa 1966) (contribution limited to those instances in which other tortfeasor does not have special defense by injured party). Many other cases, both recent and pertinent, are found in the pocketparts to appropriate topical sections of Am.Jur.2d and C.J.S.

### III.

It is difficult to square our opinion today with that which we issued just short years ago. *Brockman Mobile Home Sales v. Lee,* 98 Idaho 530, 567 P.2d 1281 (1977). If I correctly read that opinion, we applied the common liability of our statute to mean that one tortfeasor, Brockman, could not recover from the other tortfeasor, Lee, without establishing a common liability. We reversed the district court judgment on the basis that "common liability" did not exist where one defendant had a defense not available to the other. Such is also rather apparently the situation here. The State defended on the basis of the State patrolman's *exercise of discretion* in deciding to apprehend the motorcycle driver who had been observed speeding by suddenly

thrusting the patrol car into the path of the motorcycle, which was then moving at a slower rate of speed (the driver apparently knowing that he had been seen speeding). That method of apprehension was successful, but severely injured a young and criminally innocent girl who was but a passenger. The State, of course, did have the defense of governmental immunity. Even though it unsuccessfully invoked that defense, it was nevertheless a defense available to it and not to the other tortfeasor, the driver of the motorcycle. Rather than appeal the ruling which denied that special defense, the State paid the judgment which the injured passenger recovered. In that manner, the case appears to be exactly like *State v. County of Sullivan*, 54 A.D.2d 29, 386 N.Y.S.2d 253 (1976), in which the court made the point that "it should be remembered that the State could have prosecuted its appeal." 386 N.Y.S.2d at 255. It is here interesting in the extreme that the State of Idaho did not appeal, where the Idaho Supreme Court has since, even absent the urging of anyone, held that the Idaho legislature, in creating exceptions to the Idaho Tort Claims Act, did not intend to subject the State to liability for conduct which prior to the Act was considered strictly governmental and not proprietary. *Chandler Supply Co. Inc. v. City of Boise*, 104 Idaho 480, 660 P.2d 1323 (1983).

There is also merit in the Griesmers' contention that exposure to damages for a common liability cannot be said to exist where the State—assuming that it is not immune to suit—is immune from paying any substantial damages, the legislature having back in 1971 set a maximum of $100,000 on the recovery of any one tort victim. No such limitation of liability exists in favor of any other tortfeasors. Such a limitation is a defense, and is regularly pleaded and utilized as such. It is a wonderful bargaining leverage: "Sue us if you will, and even if you win, we will only have to pay $100,000." Anyone doubting need only peruse this Court's recent opinion in

*Leliefeld v. Johnson, Carnline & State*, 104 Idaho 357, 659 P.2d 111 (1983), where a severely injured Leliefeld was awarded a joint and several judgment against multiple defendants, including the State, in excess of $100,000. Applying the maximum, the district court reduced that judgment, as to the State, to $100,000—which a majority of this Court upheld as proper—although, and even though, the judgment of liability was reversed on other grounds. The constitutional issues having been decided (and I said wrongly), the State has extremely good bargaining position both with *Leliefeld* and the other defendants. If the jury now fixes the State's percentage of negligence at 95 percent, it cannot have been required to pay more than $100,000, and if defendants are assessed five percent of liability, those defendants will be unable to exact any contribution out of the State after it has once paid the $100,000. Obvious to anyone, there is no common liability where one of multiple defendants has special defenses which are peculiar to it alone. The string of citations which I have set out above include cases which make this amply clear.

### IV.

In sum, I submit primarily that the important issues raised on this appeal have not been sufficiently considered, discussed, nor addressed. My own view, subject to change, of course, should the issues receive further attention, is that I find it inconceivable that the willful and wanton act of the State patrolman directed toward an innocent girl is not an equitable bar to allowing the State contribution against a motorcycle driver whose act of negligence is prior speeding, and which had nothing to do with the collision which took place. It surely need not be said that the officer, even though affronted because he felt the driver had ignored him while in pursuit, could have found more humane means by which to apprehend his quarry—including going to a magistrate and obtaining an arrest warrant.[3] I see nothing of common liabili-

---

3. *See State v. Whelan*, 103 Idaho 651, 656, 651 P.2d 916, 921 (1982) (Bistline, J., concurring in the result).

ty. I see an opinion which is at odds with our recent *Brockman* case, and even though the issue here is obviously between two insurance carriers, I see the Court's opinion as creating bad law, and approving a manifest injustice.

"Initially, it is to be noted that officers Dedrick and Von Puckett's actions are commendable. Their first contact with the defendant resulted in an automobile pursuit which apparently by exercise of good judgment did not turn into a high-speed chase—the officers determining minor traffic infractions were not worth the risk of injury to persons or property. Media reports of high-speed automobile chases resulting in the injury or death of the parties engaged in the chase or innocent bystanders have been all too prevalent in recent years. Under these circumstances, the officers' decision that the defendant could be located the following day and that the incident did not justify extraordinary procedures for apprehension was certainly admirable."